**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA RUTH ERICKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 CV 965** |
| **v.** | ) | |
| | ) | **Hon. Ronald A. Guzman** |
| **DEUTSCHE BANK SECURITIES INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S SECOND MOTION TO COMPEL

Plaintiff, Patricia Ruth Erickson ("Plaintiff" or "Ms. Erickson"), through counsel, and pursuant to Federal Rule of Civil Procedure 37, moves to compel Defendant, Deutsche Bank Securities, Inc. ("Defendant" or "DBSI"), to respond to Plaintiff's discovery requests and this Court's October 26, 2010 and December 9, 2010 orders. In support thereof Plaintiff states as follows:[1]

## I.   COMPLIANCE WITH LOCAL RULE 37.2

After having conducted depositions and reviewing Defendant's production, it became apparent that a number of critical documents had not been produced. The parties have exchanged innumerable emails and letters trying to resolve these issues, as well as multiple conference calls during the course of discovery. Most recently, upon learning that a document withheld pursuant to a claim of privilege was in fact not privileged and that many more such documents likely exist (see section IV.F, below), counsel for Ms. Erickson sent counsel for Defendant a letter requesting that counsel for Defendant immediately schedule a conference call to discuss the

---

[1] Because some of the exhibits to this Motion contain information that Defendant has designated as confidential or privileged, pursuant to the protective order in this case and Fed. R. Civ. Pro. 26(b)(5)(B), unredacted copies of the exhibits are being filed under seal and redacted copies are being filed not under seal (although Ms. Erickson does not thereby concede that these materials are confidential or privileged).

issue. (A true and correct copy of this January 4, 2011 letter is attached hereto as "Exhibit A.") After receiving no response in the ensuing six days, counsel for Ms. Erickson sent a follow-up letter, again requesting a telephone conference to discuss the issue, and stating that motion practice would follow if the issue were not promptly resolved. (A true and correct copy of this January 10, 2011 letter is attached hereto as "Exhibit B.") Counsel for Defendant responded by denying that the document was non-privileged, declining to produce any of the requested documents, and failing to schedule a telephone conference, as requested. (A true and correct copy of Defendant's January 10, 2011 letter is attached hereto as "Exhibit C.") Instead, counsel for Defendant responded that they would undertake another review of the documents in question and were hoping to get back to counsel for Ms. Erickson by sometime early next week. Given the burdensome and costly delays that Ms. Erickson has already had to endure during discovery in this case, an additional week's delay in response to such a serious claim is simply unreasonable. Consequently, this Motion follows.

## II.    RELEVANT FACTS

Plaintiff, Patricia Erickson, was hired as a managing director of Private Wealth Management ("PWM"), a division of DBSI, in April of 2007.  DBSI is the principal American division of Deutsche Bank AG, a multinational bank headquartered in Germany. PWM, the division within which Ms. Erickson is employed, is DBSI's private banking division, which primarily serves high net-worth individuals and families, although some of its clients, such as Ms. Erickson's, are institutional and corporate entities.  Ms. Erickson is employed by a division of PWM known as Private Client Services ("PCS"), which also operates under the name Deutsche Bank Alex.Brown ("DBAB").

At the time Ms. Erickson was hired, she attempted to negotiate a signing bonus but was told that she was being offered the "standard deal." (Complaint ¶ 19). However, she was told that she would be paid substantially more than she earned at Merrill Lynch on her business, almost double the commission percentage. Upon joining DBSI, Ms. Erickson transitioned over a substantial book of business she had developed while working for Merrill Lynch. That book of business was expected to and ultimately did generate millions of dollars of revenue for DBSI. It soon became clear that, even though DBSI was strongly encouraging her to bring in business, it was not paying Ms. Erickson anything close to what it had promised when it lured her away from other attractive employment offers. Making matters worse, DBSI was not compensating Ms. Erickson in a manner consistent with other managing directors despite assuring her that her employment agreement was the standard agreement. Indeed, during discovery Ms. Erickson has learned that females and minorities are grossly undercompensated with regard to the terms of their employment contracts. DBSI only employs three female Client Advisors in PWM (Ms. Erickson's unit). Of those three, two were hired as part of a team led by a man. Thus, Ms. Erickson is the only female Client Advisor hired directly by DBSI. During discovery, Ms. Erickson learned that the "standard deal" at DBSI did in fact include a signing bonus. The standard range for the bonus was 100% to 125% of the Client Advisor's "trailing 12", which means their prior 12 month's commissions. In Ms. Erickson's case, that means she should have been offered in excess of $2 million in cash and stock at the time of her hiring. She was offered nothing. All white males hired during Ms. Erickson's employment were offered the signing bonus, even those with less than one-half of Ms. Erickson's trailing 12. The only Client Advisors with in excess of $1 million in trailing 12 who were not to be offered a signing bonus

3

were Ms. Erickson, a Hispanic male, and an Asian male. All three were offered nothing. This was only learned after DBSI was ordered to produce its documents in unredacted form.

Ms. Erickson has faced numerous hurdles during the discovery process in this case. Despite a protective order being in place, Defendant refused to produce certain documents in an unredacted format, claiming that the documents contained confidential information, until it was ordered to do so by this Court on December 9, 2010. Defendant misrepresented to this Court that it was unable to locate passwords to relevant password-protected files, when in fact it had never made a reasonable effort to locate those passwords. The passwords were made available the very day after this Court ordered Defendant to produce signed affidavits verifying that the passwords were lost. (A true and correct copy of Defendant's December 15, 2010 letter to this Court discussing the passwords is attached hereto as "Exhibit D"). Counsel for Defendant stated before this Court on October 26, 2010, that he was willing to make a representation that certain documents which Ms. Erickson sought were not relevant to her compensation, (an excerpt of the transcript of the October 26, 2010 hearing is attached hereto as "Exhibit E"; see 11:25-12:1), but counsel for Defendant has subsequently refused to produce an affidavit to that effect and has also not produced any of the documents which he asserts are not relevant. And as described below, it now appears that numerous documents either redacted or completely withheld pursuant to a claim of attorney-client or work-product privilege by Defendant are not in fact privileged at all.

In spite of these obstacles, Mr. Erickson has diligently sought to resolve the numerous issues she has faced in obtaining discovery. Nonetheless, she was eventually forced to bring these problems before this Court on October 26, 2010, in her first Motion to Compel. During the hearing on that motion, this Court ordered Defendant to produce a variety of documents which show how Ms. Erickson and similarly situated employees are paid. Despite significant efforts on

4

Ms. Erickson's part through counsel, Ms. Erickson has still not received a substantial number of basic documents which relate to the fundamental allegations in this case as was recently confirmed during depositions which were taken in New York. She is now forced to bring this matter to this Court's attention.

## III. PLAINTIFF'S DISCOVERY REQUESTS ARE REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSABLE EVIDENCE

When it comes to discovery in discrimination cases, federal courts agree that the plaintiff must be allowed to discover information that will assist him or her in establishing the alleged discrimination; this will require going beyond the specifics of the plaintiff's claim. *See Lyoch v. Anheuser-Busch Co., Inc*., 164 F.R.D. 62, 65 (E.D. Mo. 1995) It is not a sufficient objection that information sought through discovery would not be admissible at trial; what matters is that it is reasonably calculated to lead to the discovery of admissible evidence. *See*, *e.g.*, *Sykes v. Target Stores,* No. 00 C 5112, 2002 WL 554505, at *1 (N.D. Ill. April 15, 2002) (citing Fed. R. Civ. P. 26(b)(1)).

Ms. Erickson's discovery requests are narrowly tailored. As ordered by this Court on October 26, 2010, Defendant is only required to produce information relating to 35 of Ms. Erickson's comparators.

## IV. DISCOVERY SOUGHT[2]

### A. Documentation Reflecting Revenue Generated by, and Commissions Paid to, Other Client Advisors

---

[2] A true and correct copy of: Plaintiff's First Set of Document Requests to Defendant is attached hereto as "Exhibit P"; Plaintiff's Second Set of Document Requests to Defendant is attached hereto as "Exhibit Q"; Plaintiff's Fourth Set of Document Requests to Defendants is attached hereto as "Exhibit R"; Plaintiff's First Set of Interrogatories to Defendant is attached hereto as "Exhibit S"; and Plaintiff's Second Set of Interrogatories to Defendant is attached hereto as "Exhibit T."

While Defendant has produced reports which show bottom-line commissions paid to other Client Advisors, without understanding the economics that underlie these commissions, it is impossible to determine whether Ms. Erickson is being treated differently than similarly situated Client Advisors because we cannot be certain that we are comparing apples to apples.

Ms. Erickson learned during depositions in December about a number of specific reports which can be produced that reflect revenue generated by transactions conducted by Client Advisors and their clients. (e.g., "Q: If you wanted to find out how much gross revenue ... was attributable to a specific PCS client, how would you do that?" ... "A: I would create a report ... in Bloomberg TOMS ...." December 14, 2010 deposition of Hardy Manges, 92:18-93:4, an excerpt of which is attached hereto as "Exhibit F"; Bloomberg TOMS reports have not been produced). These reports are critical to establishing Ms. Erickson's claim that other Client Advisors who generate less revenue for DBSI are nonetheless being compensated more generously than her. These reports are responsive to a number of outstanding discovery requests[3] and furthermore should have been produced pursuant to this Court's October 26, 2010 order. Specifically, Defendants should have produced any documents showing revenue generated by Ms. Erickson and the 35 comparators she identified pursuant to this Court's October 26, 2010 order, including, without limitation, reports generated by Bloomberg, Pershing, DB Treasury, as well as any system within DBSI which shows such information. Reports from these systems should be produced which reflect sales commissions, sales credits, fees, depository balances maintained by

---

[3] Interrogatory No. 9, Plaintiff's First Set of Interrogatories to Defendant; Document Request No. 13, Plaintiff's First Set of Document Requests to Defendant; Document Requests Nos. 2 and 3, Plaintiff's Second Set of Document Requests to Defendant; Interrogatory No. 1, Plaintiff's Second Set of Interrogatories to Defendant; Document Request Nos. 2 and 3, Plaintiff's Fourth Set of Document Requests to Defendant.

clients, asset management balances maintained by clients, fees charged to clients, and revenue going to PCS as a result of business conducted by Ms. Erickson and her designated comparators.

Accordingly, Ms. Erickson respectfully requests that Defendant be ordered to produce any and all documents showing revenue generated by Ms. Erickson and the 35 comparators she identified pursuant to this Court's October 26, 2010 order, including, without limitation, reports generated by Bloomberg, Pershing, DB Treasury, as well as any system within DBSI which shows such information.

## B. Documents Relating to the "Grid"

Throughout this dispute, Defendant has asserted that one of the principal reasons that Ms. Erickson is not being paid commissions is that she is not marking-up her trades (i.e. charging her clients a price which is above the market price for the security). This issue has been difficult to understand because the documentation produced by DBSI to Ms. Erickson indicates that the security's "offer price" includes a mark-up by DBSI, which is called a "sales credit." Thus, anytime one of Ms. Erickson's clients purchase a security from DBSI, the assumption is that the offer price has a sales credit embedded within it. Ms. Erickson, however, has not been paid commission on certain securities that are purchased through what is called the Autobahn system. This is DBSI's software which allows its customers to purchase securities through a Bloomberg terminal (which is a popular computer system used in the financial industry to monitor financial data and place trades). According to DBSI, the offer prices shown through these terminals do not include a sales credit. Moreover, during depositions, Ms. Erickson learned that a "grid" can be applied to the prices which are displayed to clients so that clients see a price which is automatically marked-up. (Obviously the standard practice at firms is to mark up the prices of securities or the firms would not make money.) Prior to the depositions, Ms. Erickson was not

aware of the grid, and no information has been produced regarding this "grid." Because it is clearly relevant to understanding how Client Advisors are paid, these documents should have been produced[4] so that Ms. Erickson can determine whether other Client Advisors, even without the grid, are receiving commissions through a sales credit which is reflected in the offer price.

Accordingly, Ms. Erickson respectfully requests that Defendant be ordered to produce documents relating to the "grid" as well as any information showing whether other Client Advisors are being paid on trades going through the Autobahn system.

## C. Documents Relating to Selling Agreements

Because of the way in which DBSI has structured itself as a number of largely autonomous operating units, if revenue generated by a Client Advisor's clients is not booked in the same immediate unit that the Client Advisor works in, the unit which realizes the revenue will retain all of that revenue unless a "selling agreement" is in place which provides for payment of some portion of that revenue back to the unit in which the Client Advisor works. This system of selling agreements (or the purported lack thereof) has been frequently invoked by Ms. Erickson's superiors as a justification for denying her compensation. They have often claimed that a selling agreement for a given line of business is not in place, and therefore PCS is allegedly receiving no revenue on the business with which to pay Ms. Erickson. Consequently, Ms. Erickson is frequently denied any compensation whatsoever for her business.

### 1. Selling Agreements Relating to Portals

Another category of selling agreements, those with third party companies which operate "portals"—electronic platforms through which clients can invest in DBSI securities or make transactions through DBSI—have also been invoked as a justification for denying Ms. Erickson

---

[4] Pursuant to Document Requests Nos. 2, 3, and 8, Plaintiff's First Set of Document Requests to Defendant.

compensation. In this case, DBSI is asserting that selling agreements with these portals *are in place*, but that these agreements provide that the portals must be paid a fee for any business conducted through them, and as a result of this fee, there is no residual revenue left with which to pay Ms. Erickson. However, it was disclosed during depositions that some Client Advisors are being compensated for business conducted through portals for which Ms. Erickson is told no compensation is available. Kevin Bannerton testified that a team led by a male working out of Atlanta is being paid on portal business. ("Q: [D]o you know of any Client Advisors ... who do get paid a commission for purchases of DWS funds through portals?" "A: I believe there was one—one private client, private client team that received some compensation where there was a portal relationship." December 1, 2010 deposition of Kevin Bannerton, 74:12-74:19, an excerpt of which is attached hereto as "Exhibit G"). When asked why they were being paid when Ms. Erickson was not, the explanation was that it may, in part, be because the male's team's client used a portal which had more favorable terms than the portal that was being used by Ms. Erickson's clients. Consequently, it is essential to understanding how Ms. Erickson and her comparators are being paid that selling agreements between Defendant and companies operating portals be produced, and in fact these agreements should have been produced months ago,[5] as Defendant was ordered to do.

Accordingly, Ms. Erickson respectfully requests that Defendant be ordered to produce any and all documents relating to agreements between Deutsche Bank and any entities operating portals through which PCS's clients execute transactions. This includes, but is not limited to,

---

[5] Pursuant to Document Request No. 3, Plaintiff's First Set of Document Requests to Defendant; Interrogatory No. 1, Plaintiff's Second Set of Interrogatories to Defendant; Document Request No. 1, Plaintiff's Fourth Set of Document Requests to Defendant.

agreements with the Chicago Mercantile Exchange, Bank of New York, Brown Brothers Harriman, Sungard, and LaSalle Bank.

### 2. Selling Agreements Relating to Omnibus Accounts

Another method by which clients can invest in Defendant's products is through an omnibus account (also called a sweep account). This is an account that pools the assets of many clients and invests them collectively through a single "omnibus" account, which has certain advantages such as simplified bookkeeping and lower costs. Ms. Erickson has also not received any compensation during her tenure at Deutsche Bank for any of the substantial business that her clients conduct through omnibus or sweep accounts.

Kevin Bannerton, the 30(b)(6) witness identified by DBSI, testified that PCS is receiving revenue from Ms. Erickson's omnibus business and that Ms. Erickson should be receiving commissions on that business. ("Q: [T]he payout to PCS, when it purchases its shares of Fund 250 through an omnibus account is eight basis points?" "A: That's correct." December 15, 2010 deposition of Kevin Bannerton, 116:16-116:19, a excerpt of which is attached hereto as "Exhibit H"); ("Q: Are you aware of anybody else working for PCS that is getting paid commission for [s]elling interest[s] in the DWS funds?" "A: I believe there are several Client Advisors who are receiving commissions on selling or for selling DWS money market funds ... I know that Trish Erickson would fall in that category." Exhibit G, 61:13-62:16). However, she has not been compensated for this business.

It was also disclosed during depositions that Pershing LLC is an entity that receives a fee from PCS for business conducted through an omnibus or sweep account. (See Exhibit H, 128:18-

128:25). However, no agreement has been produced which governs this fee arrangement. Any such documents should have been produced. [6]

Therefore, Ms. Erickson respectfully requests that Defendant be ordered to produce any agreement between Pershing, or any other entity, and Defendant relating to fees charged in connection with omnibus or sweep accounts so that Ms. Erickson can determine how much compensation she is entitled to.

### D. Documentation Relating to Hiring Procedures

At the time Ms. Erickson was hired, she was told that she was receiving the "standard deal." (Complaint ¶ 19.) However, at least since the inception of the present dispute, Defendant has done an about face and now claims that the reason that Ms. Erickson was offered a significantly less favorable employment contract than comparable employees is because hers was a "*non*-standard deal." There has been no consistent explanation as to why this is the case. Some internal memoranda suggest that it is precisely *because* Ms. Erickson was given such an unfavorable deal that it is considered non-standard, not the other way around. (See, e.g., DB FED 1031475 in the email and attached memorandum attached hereto as "Exhibit I"). One email from a human resources manager refers to Ms. Erickson as an "inexpensive" hire. (A true and correct copy of this email is attached hereto as "Exhibit J.") Other documents state that Ms. Erickson was not given the standard deal because she allegedly lacked a "trailing 12," (see, e.g., email attached hereto as "Exhibit K"), despite the fact that nearly every internal document that addresses the issue of Ms. Erickson's trailing 12 at the time of hire shows it to be at or above $2 million—one of the most substantial trailing 12s of any of her peers, (See, e.g., Exhibit I, DB FED 1031475).

---

[6] Pursuant to Document Request No. 3, Plaintiff's First Set of Document Requests to Defendant.

Finally, it was revealed for the first time during depositions that Defendant's human resources department consulted a number of flow charts during the hiring process to allegedly ensure that they were following a standardized process. (Deposition of Janis Simat, 26:9-26:19, an excerpt of which is attached hereto as "Exhibit L"). These charts have not been produced, but are relevant and should have been produced.[7]

Therefore, Ms. Erickson respectfully requests that Defendant be ordered to produce any and all flow charts available to Defendant's human resources (or any similar) department for use during the hiring process.

**E. Documents Relating to the Distribution of Accounts**

Ms. Erickson has alleged that, following the departure of another managing director, Kevin Lynch, Mr. Lynch's accounts were distributed to male DBSI personnel. However, despite Ms. Erickson's concentration on institutional clients, none of Mr. Lynch's institutional accounts were distributed to Ms. Erickson. Ms. Erickson seeks to understand why Mr. Lynch's accounts were distributed in the manner that they were. Defendant agreed in its Responses and Objections to Plaintiff's First Set of Document Requests to produce such documents,[8] but none were produced. (A true and correct copy of Defendant's Responses and Objections to Plaintiff's First Set of Document Requests is attached hereto as "Exhibit M.")

Accordingly, Ms. Erickson respectfully requests that Defendant be ordered to produce any and all documents relating to the distribution of Kevin Lynch's accounts after his departure from DBSI.

---

[7] Pursuant to Document Requests Nos. 2 and 8, Plaintiff's First Set of Document Requests to Defendant; Interrogatory No. 10, Plaintiff's First Set of Interrogatories to Defendant.
[8] Pursuant to Document Request No. 12, Plaintiff's First Set of Requests to Defendant.

**F. Documents Withheld or Redacted Pursuant to a Claim of Privilege**

On December 9, 2010, this Court ordered Defendant to produce certain documents without any redaction of information relating to other employees. Defendant subsequently re-produced these documents in a format that still contained some redactions, with no explanation as to why the redactions were still there despite this Court's order. When counsel for Ms. Erickson inquired as to the reason for these redactions, Defendant produced a Supplemental Privilege Log which stated that the documents had been redacted on the basis of the attorney-client privilege. (A true and correct copy of Defendant's letter with attached Supplemental Privileged Documents Log are attached hereto as "Exhibit N.") However, on information and belief, none of the individuals who sent or received these emails are attorneys.

In subsequently reviewing Defendant's production, counsel for Ms. Erickson discovered that one of the aforementioned emails allegedly redacted pursuant to the attorney-client privilege had also been produced in unredacted format. In reviewing the unredacted version of the email, it is clear that the email is <u>not</u> covered by the attorney-client privilege. The email was sent from a non-attorney to a non-attorney and did not reveal the substance of any privileged, attorney-client communication.[9] (A true and correct copy of the email is attached hereto as "Exhibit O"; Defendant claims that the page stamped "DB FED 1019172" contains privileged information.) There is simply no legitimate reason to have redacted the information. As a result of this wrongful withholding of information pursuant to a claim of attorney-client privilege, counsel for

---

[9] Defendant nonetheless asserts that the unredacted document is privileged and has consequently requested that it be returned, sequestered, or destroyed pursuant to Fed. R. Civ. Pro. 26(b)(5)(B). Counsel for Ms. Erickson has accordingly sequestered the document until this Court can determine the validity of the claim. Pursuant to the aforementioned Rule, the document is being filed under seal for a determination of the claim.

Ms. Erickson is now questioning the methods employed by Defendant to make determinations as to which documents are covered by the attorney-client and work-product privileges. The overwhelming majority of documents withheld in Defendant's Privilege Log, and, upon information and belief, all of the documents identified in its Supplemental Privilege Log, are not to or from attorneys.

Consequently, Ms. Erickson is respectfully requesting that this Court order Defendant to produce all non-privileged documents withheld pursuant to a claim of privilege and that such documents be produced in unredacted form or that this Court conduct an *in camera* review of the documents to determine whether Defendants have improperly withheld other documents and information in this case.

**WHEREFORE**, for the foregoing reasons, Ms. Erickson respectfully requests that this Court (1) order Defendant to comply in full with all aforementioned discovery requests and orders of this Court; (2) award attorneys' fees for the instant motion in light of Defendant's lack of due diligence and persistent refusal to conduct discovery in good faith; and (3) award any further relief which this Court deems just and appropriate.

Respectfully submitted,

**PATRICIA ERICKSON**

/s/ Ruth I. Major

_____
One of Her Attorneys

**Dated**: January 13, 2011

Ruth I. Major (ARDC No. 6205049)
Laura M. Rawski (ARDC No. 6300636)
The Law Offices of Ruth I. Major, PC
225 West Washington Street, Suite 2200
Chicago, IL 60606

14

Tel: (312) 893-7544
Fax: (312) 698-9867
rmajor@major-law.com
lrawski@major-law.com