IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA RUTH ERICKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 Civ. 0965 |
| v. | ) | |
| | ) | Hon. Ronald A. Guzman |
| DEUTSCHE BANK SECURITIES, INC., | ) | Hon. Arlander Keys |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO PLAINTIFF'S SECOND MOTION TO COMPEL</u>**

SIDLEY AUSTIN LLP
Cliff Fonstein
Nicholas H. De Baun
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendant
Deutsche Bank Securities Inc.*

Defendant Deutsche Bank Securities Inc. ("DBSI"), by and through its counsel, Sidley Austin LLP, respectfully submits this memorandum of law in opposition to Plaintiff's second motion to compel.

## INTRODUCTION

Plaintiff's latest discovery motion is an abuse of this forum and a waste of the Court's (and Defendant's) time and resources. Nearly a month after the close of discovery, Plaintiff is seeking to compel Defendant to produce voluminous trading reports, not in aid of the instant discrimination action, as she claims, but rather in aid of her claims in a parallel arbitration proceeding pending before the Financial Industry Regulatory Authority ("FINRA"). Indeed, Plaintiff brought a motion before the FINRA arbitration panel on December 29, 2010, requesting many of the same documents sought by the instant motion, and then, as a backstop to the FINRA motion, filed this motion weeks later.

As we explain below, each one of the documents sought by this motion were either (1) never requested by Plaintiff in this action at any time; (2) requested by untimely discovery demands that plaintiff served on the day discovery closed; or (3) already responded to by DBSI. Plaintiff attempts to conceal these facts from the Court in her voluminous motion papers by never directly quoting any of the requests to which she purports to compel responses, and burying her citations to the supposedly germane discovery requests in the footnotes of her motion, in the apparent hope that the Court will grant her requests without reviewing them. Plaintiff's motion is nothing more than an improper attempt to use the Court as a cat's paw in the FINRA arbitration, and the Court should deny Plaintiff's untimely motion in its entirety.

## BACKGROUND OF THE CASE

Plaintiff is a Client Advisor ("CA") in the Private Client Services Group ("PCS") at DBSI – her role is what the public would typically call a "stockbroker." Unlike many Client

Advisors, Plaintiff's clients are generally institutions rather than individuals, and Plaintiff specializes in fixed income products (e.g. bonds) rather than stocks.

Like all CAs in PCS, plaintiff is paid on a commission basis. The amount of commission she is entitled to receive is governed by an employment agreement she entered into with PCS when she began working there, and by a Commission Guide applicable to all CAs. Most notably, if PCS does not earn revenues in connection with a transaction effected by the CA, the CA does not earn any commission. This can happen, *inter alia*, if the CA sells an investment product that is not offered by PCS, but by some other division of Deutsche Bank. In that case PCS will earn revenues only if it has an agreement with the other division of Deutsche Bank to share revenues related to that product, or if the CA "marks up" the price to the client, that is, if the client is willing to pay a spread above the price the CA is able to secure.[1]

Plaintiff's dispute with DBSI is nothing more than attempt to avoid the clear terms of her employment agreement – a binding agreement that she personally negotiated. In plain disregard of the terms of that agreement, and in plain disregard of the terms of the Commission Guide, Plaintiff seeks additional compensation from DBSI based on a kaleidoscope of unsupported allegations, rhetoric and legal theories, all of which spring from her meritless contention that DBSI should compensate her for transactions conducted by her clients with other business units of DBSI, despite the fact that her employment agreement and DBSI's policies do not give her any right to compensation on those transactions, and despite the fact that DBSI does not compensate any other CAs, male or female, for the same type of transactions.

In addition to this action, Plaintiff has also commenced an arbitration against DBSI in the Financial Industry Regulatory Authority ("FINRA"). In the FINRA arbitration, plaintiff makes

---

[1] The practice of "marking up" (or "marking down") the price of securities by a broker-dealer is a wholly permissible and regulated activity.

substantially the same factual allegations she makes here, but instead of claiming gender discrimination, she claims she was fraudulently induced to join DBSI and that DBSI breached her employment contract.

In connection with discovery in this action, DBSI has produced more than 40,000 pages of documents. The documents produced by DBSI include detailed commission reports for the past three years for Plaintiff and more than two dozen of her colleagues that she contends are similarly situated, revenue-sharing agreements between PCS and other divisions of Deutsche Bank ("selling agreements"), documents reflecting total compensation for plaintiff and each of her purported comparators including W-2 forms, employment agreements, and information regarding participation in deferred compensation plans. The documents produced by DBSI fully satisfy all of the demands that Plaintiff initially propounded in this case (to the extent DBSI did not object), as well all documents it was directed to produce by the Court in its decision on Plaintiff's prior motion to compel.

After the Court denied a motion by Plaintiff to extend the discovery period, discovery closed in this action on December 15, 2010. That same day, Plaintiff served her Fourth Set of Document Requests and her Second Set of Interrogatories, both of which purported to require Defendant to respond by January 14, 2010 – thirty days after the close of discovery. Prior to the close of discovery, Plaintiff deposed several witnesses in December, and took the deposition of DBSI by a Rule 30(b)(6) notice, questioning six witnesses on more than 30 topics first noticed by Plaintiff on November 16, 2010. The 30(b)(6) depositions concluded on the last day of the discovery period.

On December 29, 2010, Plaintiff brought a motion before the FINRA arbitration panel to compel DBSI to produce a host of reports and information related to transactions undertaken by her clients. In particular, Plaintiff sought "revenue reports" related to fixed income trading done

3

by her clients – despite the fact that DBSI had already produced complete commission reports for Plaintiff and a group of potential comparators.[2] Plaintiff also sought information related to the activity of PCS clients with separate business units of Deutsche Bank outside of PCS, including asset management activity (including so-called "portal" business and "sweep" accounts) and depository business.[3]

Weeks later, and without first conferring with Defendant, Plaintiff brought the instant motion on January 13, 2011, seeking the same information requested in the FINRA action. Additionally, Plaintiff also seeks by her motion any "flow charts" related to any hiring process and documents related to the distribution of the accounts of another CA upon his departure from DBSI – though Plaintiff offers no coherent explanation for why these issues are being raised now for the first time, a month after discovery closed. Finally, Plaintiff seeks to compel the *en masse* production of documents from Defendant's privilege log because Plaintiff "is now questioning the methods employed by Defendant to make determinations as to which documents are covered by the attorney-client and work product privileges," ostensibly because Plaintiff disagrees with the application of the privilege to intra-corporate communications between non-attorneys which disclose other conversations with corporate attorneys.

As explained below, none of these requests are timely, and most of them are being propounded for the first time in this case weeks after the close of discovery. In fact, the timing of Plaintiff's motion and the fact that the discovery she now seeks bears little resemblance to the discovery she actually requested in this action proves that Plaintiff is using the discovery

---

[2] The Court, by the Hon. Ronald A. Guzman, already presided over a dispute concerning the scope of comparators to be included in discovery, settling on a procedure whereby Plaintff selected 35 potential comparators for discovery.

[3] The FINRA arbitration panel recently denied most of Plaintiff's motion in an oral order on January 17, 2011.

4

procedures of this forum to gain an improper advantage in the FINRA arbitration. Accordingly, Plaintiff's motion should be denied

## ARGUMENT

### A. Plaintiff Already Has Complete Information Concerning the Revenue Generated by, and Commissions Paid to, Other Client Advisors, and, in Any Event, Plaintiff Never Requested the Reports Discussed in Her Motion.

As noted above, following a disagreement between the parties over the appropriate population of CAs that should be included in DBSI's production of information concerning potential comparators, the Court established a procedure whereby Plaintiff would select up to 35 purported comparators and DBSI would provide commission reports and other compensation data for those identified individuals.[4] By November 18, 2010, DBSI's production of this information was complete with respect to the entire population at issue.

Most notably, DBSI produced commission reports, known as "NSTARS" reports, for Plaintiff and the alleged comparator population. In addition to monthly summary information, the NSTARS reports show *every single trade* that the CA's clients transacted, including trade date, price, quantity, the gross commission (*i.e.* PCS's revenue) generated by the trade, the payout percentage applicable to the gross commission and the payout amount to the CA on the trade (*i.e.* her compensation for the trade). In short, the NSTARS reports provide all the information that a CA needs to see in order to understand his or her compensation – and all the information one needs in order to determine whether Plaintiff's compensation has been calculated by some discriminatory method.

---

[4] DBSI has subsequently learned that, although plaintiff moved the Court to compel production of this information, she had improperly removed from DBSI compensation data for more than 200 of her colleagues in December 2009, and then failed to produce those documents in this case for more than six months after DBSI served discovery requests that called for such documents, although she represented numerous times during this period that her production was complete.

5

By her motions to FINRA and this Court, Plaintiff is seeking other reports that she apparently believes will shed light on other "revenue" generated by CAs. Plaintiff is simply wrong: other systems capable of generating reports are merely duplicative of information already contained in the NSTARS reports, and to the extent they might reveal any other "revenue" generated by client activity, that revenue would belong to other Deutsche Bank business units outside of PCS and would not (and could not) factor into the calculation of PCS revenues or compensation for Plaintiff or any other CA. Plaintiff seeks this information only to support her (baseless) claim in arbitration that she should be paid whenever any unit of Deutsche Bank recognizes revenue as a result of transactions with the clients she covers, regardless of what her employment agreement or the Compensation Guide say on the subject, regardless of whether she was actually involved in consummating the transaction, and regardless of whether PCS has ever paid any CA for such transactions at any time.[5]

Of course, Plaintiff does not discuss any of this in her brief. In the guise of supporting her discrimination allegations, Plaintiff asserts "While Defendant has produced reports which show bottom-line commissions paid to other Client Advisors, without understanding the economics that underlie these commissions, it is impossible to determine whether Ms. Erickson is being treated differently than similarly situated Client Advisors because we cannot be certain that we are comparing apples to apples." (Pl.'s Br. at p. 6.) After making this conclusory assertion, however, Plaintiff fails to describe any specific problems whatsoever in making "apples to apples" comparisons. Indeed, she does not describe what underlying "economics" are not revealed by the NSTARS reports, nor does she describe what other information she expects any other reports to contain that would allow her to understand those unexplained "economics."

---

[5] Some of the institutions covered by Plaintiff have contacts within other Deutsche Bank business units and may transact business without any involvement by Plaintiff or PCS.

Similarly, Plaintiff does not cite any deposition testimony that would support her assertions of confusion over the data, and, in fact, she did not ask any questions of DBSI's designated 30(b)(6) witnesses regarding particular transactions that would suggest any confusion over the meaning of any detail in the NSTARS reports. In truth, as noted above, all of the information concerning specific trade details, gross commissions, payout percentages and payout amounts is already contained in the NSTARS reports, and Plaintiff is only requesting additional reports in the hopes that they will contain data about revenue accruing outside of PCS. Notably, the FINRA panel recently agreed with DBSI and denied Plaintiff's motion for precisely the same reports.

Though the foregoing discussion plainly reveals the irrelevance of the requested reports and Plaintiff's ulterior motive in bringing her motion, the Court need not even wade into the foregoing issues in order to deny Plaintiff's motion. The simple fact is that Plaintiff never requested the assorted reports she now claims to need, and the specific interrogatories and document requests cited by Plaintiff in support of her motion have actually been satisfied. Although Plaintiff failed to discuss her specific discovery requests – and instead buried them in a citation in a footnote in her brief – we discuss each request cited by Plaintiff, in turn, below.

First, Plaintiff requested the identity of "all managing directors in PWM generating less total revenue for Deutsche Bank then Ms. Erickson on an annual basis for 2007, 2008, and 2009." (Int. No. 9, Pl.'s 1st Set of Int.) DBSI responded by referring Plaintiff to its production of "production rankings for relevant Client Advisors." (Supp. Resp. and Obj. to Pl.'s 1st Set of Int., Response to Int. No. 9, excerpted and attached to the Declaration of Nicholas H. De Baun ("De Baun Decl."), submitted herewith, as Exh. A.) Thus, contrary to Plaintiff's deceptive citation in a footnote, Interrogatory No. 9 did not remotely request the reports she seeks, and DBSI has answered the interrogatory.

7

Next, Plaintiff requested "Monthly summary reports for all PWM managing directors reflecting a breakdown that details all products and transaction volume . . ." (Doc. Req. No. 13, Pl.'s 1st Set of Doc. Req.) This request describes the NSTARS reports that have already been produced. In fact, in addition to the monthly summaries in the NSTARS reports, DBSI has, as noted above, included NSTARS reports that show *every single trade* completed by Plaintiff and the potential comparator population. In short, Request No. 13 was satisfied.

In her Second Set of Document Requests, served in November such that Defendant's response was due just before the close of discovery, Plaintiff requested "All documents concerning the total revenue, by client, by product, by month, for Defendant's Chicago branch." (Doc. Req. No. 2, Pl.'s 2nd Set of Doc. Req.) DBSI objected to this vague and overbroad request, but responded that it would produce "monthly financial results reports for its Private Client Services Group Chicago branch office" to satisfy the request. (Resp. and Obj. to Pl.'s 2nd Set of Doc. Req., Response to Req. No. 2, excerpted and attached to the De Baun Decl. as Exh. B.) Subsequently, Plaintiff never met and conferred with Defendant over Request No. 2. In any event, Request No. 2 relates only to the Chicago branch office, not to individual CAs, and has no relevance to Plaintiff's claimed need to ensure that she is "comparing apples to apples" when comparing data about her commissions with data relating to others.

Plaintiff also requested "All documents concerning total revenue, by client, by product, by month for each of Ms. Erickson's clients. . ." (Doc. Req. No. 3, Pl.'s 2nd Set of Doc. Req.) DBSI objected to the request because it is vague and ambiguous and unduly burdensome, especially when viewed in the context of DBSI having produced complete commission reports for Ms. Erickson showing all of the PCS revenue associated with each and every trade Ms. Erickson brokered. (Resp. and Obj. to Pl.'s 2nd Set of Doc. Req., Response to Req. No. 3, excerpted and attached to the De Baun Decl. as Exh. B.) As with Request No. 2 above, Plaintiff

8

never met and conferred with Defendant over Request No. 3. Moreover, Request No. 3 relates only to Plaintiff and in no way justifies Plaintiff's motion seeking a variety of reports relating to other CAs.

On December 15, 2010, the last day of the discovery period, Plaintiff propounded her Second Set of Interrogatories asking for information about client investments through "portals" in a particular Deutsche Asset Management fund.[6] On January 13, 2010, before any response to Plaintiff's untimely interrogatories would even have been due, Plaintiff brought her motion to compel. On January 14, 2010, DBSI objected to the interrogatory because it is untimely and irrelevant. Nevertheless, even if it were not invalid, Plaintiff's interrogatory would not require the production of any reports whatsoever, much less the reports mentioned in Plaintiff's motion.

Also on the last day of the discovery period, Plaintiff propounded her Fourth Set of Document Requests. Before any responses would even have been due, Plaintiff brought her motion. Request No. 2 in her Fourth Set of Document Requests requested "Any and all documents relating to compensation paid to Client Advisors . . . related to purchases of DWS Money Market Series Institutional Shares, Fund #2403 through a portal." Again, DBSI objected to the untimely and irrelevant request, and, once again, even if the request were not invalid, the request would not require the production of the various reports sought in Plaintiff's motion.

Finally, Plaintiff's Request No. 3 in her Fourth Set of Document Requests was also untimely and also does not call for the broad production of reports demanded in Plaintiff's motion. The request sought an assortment of reports and forms related to three particular CAs, none of whom were among the numerous purported comparators originally selected Plaintiff. As with the other untimely requests, Plaintiff brought her motion before DBSI's response would

---

[6] A "portal" in this context is a third-party financial institution that purchases a Deutsche Asset Management fund on behalf of its clients. PCS is not involved in such transactions, and ordinarily, the identity of the underlying client investing through the portal is not disclosed to Deutsche Asset Management.

have been due. DBSI objected to the request in its entirety, and the Court should similarly deny Plaintiff's untimely and irrelevant request.

As shown above, Plaintiff never requested the reports described in her motion. This fact, standing alone, justifies the denial of Plaintiff's motion. Furthermore, the fact that Plaintiff never requested the reports only underscores the fact that Plaintiff is now attempting to use the federal discovery apparatus to achieve her goals in the FINRA arbitration proceeding. The Court should deny Plaintiff's motion.

**B.**     **Plaintiff is Wrong About the Existence of a "Grid" on Autobahn Transactions, and Plaintiff Never Requested Documents Concerning the Hypothetical "Grid" Discussed in Her Motion.**

Plaintiff claims that she needs discovery concerning a "grid" for Autobahn, an electronic platform used by Deutsche Bank business unit outside of PCS called Global Markets, to trade fixed income products. Plaintiff asserts that she learned in depositions that "a 'grid' can be applied to the prices displayed to clients" on Autobahn, which would enable her to charge her client a spread on the transaction and generate revenue for PCS. (Without such a "grid," clients transact at the price offered directly by the Global Markets unit, and PCS receives no revenue as a result, meaning that the CA receives no commission.) Plaintiff claims that "no information has been produced regarding this 'grid'" and that "these documents should have been produced . . ." (Pl.'s Br. at 7-8.)

Plaintiff's "request" is a red herring. There is no testimony or evidence suggesting that such a hypothetical "grid" has ever actually existed (nor does plaintiff point to any) and there is no testimony or evidence to suggest that any CA has ever been paid for any transaction a client has executed through the Autobahn platform. Accordingly, even if the Court were to order DBSI to produce documents about a so-called "grid" for Autobahn, there would be nothing to produce.

10

Additionally, keeping with her practice of citing inapposite discovery requests to support her motion, Plaintiff has cited three requests, none of which actually calls for documents about any "grid" for Autobahn. Specifically, the requests cited by Plaintiff call for documents relating to compensation plans applied to CAs (Req. No. 2, Pl.'s 1st Set of Doc. Req.); documents reflecting selling agreements necessary to conduct fixed-income business (Req. No. 3, Pl.'s 1st Set of Doc. Req.); and documents concerning compensation guidelines (Req. No. 8, Pl.'s 1st Set of Doc. Req.). Suffice it to say, none of these three requests can be read to call for the production of documents concerning a non-existent "grid" for an electronic trading platform run by another unit outside of PCS – a platform which generates no commissions for PCS. Moreover, Plaintiff never conferred with Defendant about her desire for documents concerning the hypothetical "grid." Plaintiff is simply wasting the Court's time.

## C. Plaintiff Never Requested Agreements Related to Asset Management Portals or "Omnibus," "Sweep" Accounts.

As with the other purported "requests" in her motion, Plaintiff's attempt to compel discovery of agreements related to portal asset management business and "omnibus" "sweep" accounts fails for the simple reason that Plaintiff never requested any such agreements.

### 1. Portal agreements

Plaintiff claims to need discovery of agreements between Deutsche Asset Management and the third-party investment "portals" that invest money with Deutsche Asset Management. Such agreements would not fall within the scope of her Request No. 3, which was limited to selling agreements between PCS and other business units within DBSI pursuant to which CAs could be paid for transacting fixed income business.[7] (Req. No. 3, Pl.'s 1st Set of Doc. Req.)

---

[7] Plaintiff also cites an interrogatory and a document request that were both served on the last day of the discovery period. As noted above, Plaintiff brought her motion before responses to the invalid requests would have even been due. In any event, those requests are untimely and irrelevant. If anything, the fact that Plaintiff thought she

11

Moreover, Plaintiff misrepresents the real reason why one team of CAs was paid on portal asset management business in one instance: the portal in question was a "disclosed portal," meaning the nature of the portal discloses the identity of the underlying client to Deutsche Asset Management, and there was a dispute about how the client was introduced to Deutsche Asset Management (i.e. PCS vs. the portal). (See Transcript of Deposition of Kevin Bannerton (Exh. G to Pl.'s Motion) at 74:12-76:20.) Such circumstances clearly eviscerate any argument that Plaintiff is similarly situated to that single CA team, as her clients investing in Deutsche Asset Management have, to the Bank's knowledge, only invested, if at all, in undisclosed portals, and Plaintiff and PCS had nothing to do with the genesis of any portal client's investment. Indeed, Plaintiff makes no attempt to argue that she is similarly situated based on those factors. Accordingly, Plaintiff's untimely request on this topic should be denied.

### 2. "Omnibus" agreements

Plaintiff also claims that she has not been paid on "omnibus," "sweep" account business conducted by her clients, and, therefore, she needs discovery of an agreement with a third-party, Pershing LLC, regarding such accounts. (Pl.'s Br. at 10-11.) Once again, the requested agreement would not fall within the scope of her Request No. 3, as it would not be the type of intra-corporate agreement called for by that request, nor is it the type of agreement "necessary in order to conduct fixed-income business," as specified in the request.

Moreover, Plaintiff misleads the Court when she claims that there is testimony suggesting that other Client Advisors have been paid on "omnibus" "sweep" business. Such jargon refers to PCS's practice of aggregating the available cash from all of its accounts into one omnibus account for short-term investment in a money market fund run by a Deutsche Bank business unit

---

needed to serve additional requests to capture agreements with portals simply makes it clear that Plaintiff's Request No. 3 did not relate to such agreements.

outside of PCS. PCS has never paid any Client Advisors based on this practice, which is carried out without the involvement of Client Advisors. Contrary to Plaintiff's assertions, the testimony only indicates that when PCS Client Advisors successfully *sell* money market funds, PCS and the Client Advisor get paid on that business. (See Bannerton Dep. Tr. (Exh. G to Pl.'s Motion) at 61:13-62:21.) But that has nothing to do with the practice of automatically "sweeping" client cash into a giant "omnibus" account for a wholesale investment in a money market fund, and Plaintiff is wrong to suggest otherwise to the Court.

### D.     Plaintiff Never Requested Documents Relating to Hiring Procedures.

Plaintiff claims to need discovery of certain flow charts related to hiring processes mentioned in the deposition of a former member of DBSI's Human Resources department. Once again, closer inspection of the requests cited by Plaintiff shows that she never actually requested those documents. Specifically, the cited requests sought: documents relating to compensation plans (Req. No. 2, Pl.'s 1st Set of Doc. Req.); documents concerning compensation guidelines provided to employees (Req. No. 8, Pl.'s 1st Set of Doc. Req.); and factors taken into consideration for "internal mobility" and "monetary awards" (Int. No. 10, Pl.'s 1st Set of Int.).

These requests clearly have nothing to do with the flow charts Plaintiff now claims to need. Accordingly, Plaintiff's motion represents an abuse of the discovery process (apparently premised on the notion that the Court will not actually pay attention to the citations in her footnotes and track down the specific requests cited therein), and should be denied.

### E.     DBSI Has Already Produced Documents Relating to the Distribution of Kevin Lynch's Accounts.

Plaintiff seeks to compel DBSI to produce documents that it agreed to produce. Plaintiff claims no such documents have been produced. Plaintiff is simply wrong. To extent such documents exist, they were produced long ago, as plaintiff would have learned if she had

bothered to confer with DBSI in accordance with the rules of this Court prior to bringing this motion. Instead, she has wasted the Court's time trying to compel the production of documents that are already in her possession.[8]

**F.     Plaintiff Is Wrong to Suggest that the Attorney-Client Privilege Does Not Justify the Partial Redaction of an Intra-Corporate Email That Discloses The Substance of a Discussion with Corporate Counsel.**

Perhaps to lend an air of timeliness to her motion, Plaintiff brings before the Court an issue that she raised for the first time some nine days before filing her motion. Having found an email in DBSI's production that was produced in redacted form and also inadvertently produced in unredacted form, she immediately declared, in a conclusory fashion, that the redacted portion was not privileged and demanded production of every document withheld as privileged by DBSI that was not authored by or sent to an attorney. (See Exh. A to Pl.'s Motion.) In so doing, Plaintiff overlooked settled law that extends the attorney-client privilege to intra-corporate communications among non-attorneys that disclose the substance of an attorney-client communication. See, e.g., Heriot v. Byrne, 257 F.R.D. 645, 665 n.14 (N.D. Ill. 2009) (holding that "privilege applies when the communications between non-lawyer employees 'reveal, directly or indirectly, the substance of a confidential attorney-client communication'").

In keeping with the tactics displayed throughout the rest of her motion, plaintiff provides the Court only with the unredacted version of the email in question and does not identify the redacted portion, blithely telling the Court that "Defendant claims that the page stamped 'DB FED 1019172' contains privileged information." (Pl.'s Br. at 13.) In fact, DBSI redacted only a portion of that page that begins with the words "With respect to…" (See Sealed Exh. I to Pl.'s

---

[8] In preparing its response to this motion, DBSI learned that a small number of documents relating to the distribution of Mr. Lynch's accounts was inadvertently omitted from DBSI's production. Those documents are being produced now. The pertinent information contained in those documents was previously disclosed to plaintiff in response to a request for information propounded by her in the parallel FINRA arbitration.

Motion.) The redacted portion clearly discloses the fact that the employee was discussing a specific issue with counsel, and thus, easily meets the conditions for the attorney-client privilege to attach. It is irrelevant that the communication does not actually reveal counsel's legal advice; the privilege extends to all "communications between non-lawyer employees [that] reveal, directly or indirectly, the substance of a confidential attorney-client communication." See Heriot, 257 F.R.D. at 665 n.14 (adopting approach that "follows the jurisprudential path cleared by the attorney-client privilege itself, which protects communications that 'tend directly or indirectly to reveal the substance of client confidence'").

In sum, DBSI appropriately protected a privileged communication and Plaintiff's request that DBSI turn over all similarly privileged communications is meritless.

## Conclusion

For the foregoing reasons, Deutsche Bank Securities Inc. respectfully requests that this Court deny plaintiff's Second Motion to Compel in its entirety, together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 20, 2011

                                                  SIDLEY AUSTIN LLP

                                                  By: s/ Nicholas H. De Baun
                                                       Nicholas H. De Baun

                                                  787 Seventh Avenue
                                                  New York, New York 10019
                                                  (212) 839-5300

                                                  *Attorneys for Defendant*
                                                   *Deutsche Bank Securities Inc.*

## CERTIFICATE OF SERVICE

I, Nicholas H. De Baun, hereby certify that on January 20, 2011, a true and correct copy of the foregoing Defendant's Memorandum of Law in Opposition to Plaintiff's Second Motion to Compel was served by email and by U.S. Mail, postage prepaid upon the following:

> Ruth I. Major, Esq.
> The Law Offices of Ruth I. Major, PC
> 225 West Washington Street, Suite 2200
> Chicago, Illinois 60606
> rmajor@major-law.com

                                                s/ Nicholas H. De Baun