**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **PATRICIA RUTH ERICKSON,** ) | |
| ) | |
| Plaintiff, ) | Case No. 10-CV-965 |
| ) | |
| v. ) | Judge Ronald A. Guzman |
| ) | |
| **DEUTSCHE BANK SECURITIES, INC.,** ) | Magistrate Judge Arlander Keys |
| ) | |
| Defendant. ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S SECOND MOTION TO COMPEL**

Plaintiff, Patricia Ruth Erickson ("Plaintiff" or "Ms. Erickson"), through counsel, and pursuant to Federal Rule of Civil Procedure 37, for her reply in support of her second motion to compel states as follows:

**INTRODUCTION**

As explained in greater detail in her principal brief, Ms. Erickson has faced significant obstacles in obtaining key documents in this case. Defendant has misrepresented before this Court that it could not locate passwords to relevant password-protected documents (but was subsequently able to locate them the very day after this Court ordered Defendant to produce affidavits verifying that the passwords could not be located). Defendant represented before this Court that, after having produced only two selling agreements, that it had produced all relevant selling agreements. Subsequently, late in the evening on the night before Rule 30(b)(6) depositions were scheduled to be taken in regard to selling agreements, Defendants produced seventeen additional selling agreements (and produced one more at an even later date). Defendants unilaterally chose to redact thousands of pages of documents, and despite a protective order being in place, refused to produce unredacted—or even to re-redact the documents to comply with this Court's orders regarding comparators about whom information

should be produced—until ordered to do so by this Court. Counsel for Defendant stated before this Court that he would make a representation to the effect that certain documents Ms. Erickson was requesting were not relevant, but he has subsequently declined numerous requests to produce an affidavit to that effect. And even to this day the problems continue, as Defendants now state, in a footnote to their response, that there are more documents that have not yet been produced. (Def.'s Memo. p.14 n.8.) (As of January 21, 2011, 3:30 p.m. C.S.T., counsel for Ms. Erickson has not yet received the documents noted in said footnote.)

Ms. Erickson has had to fight tooth and nail to obtain discovery that would absolutely be expected in a case like this. Ms. Erickson, an individual with limited resources, who is seeking redress from a multibillion-dollar global financial institution, has had to expend a substantial amount of money just to get Defendants to comply with its obligations under the Federal Rules of Civil Procedure. The objective of Defendant at all times has clearly been to try to prevent Ms. Erickson from obtaining the information she needs to fully establish her claim to damages. The recent brief submitted to this Court is no exception.

Defendant objects throughout its brief to the fact that much of the discovery sought in this case overlaps with discovery sought in the related Financial Industry Regulatory Authority ("FINRA") arbitration. While this is obviously of no relevance to the instant case, which should be judged on its own merits and not on whether it is similar to a parallel arbitration, Defendant's inflammatory speculation as to Ms. Erickson's motives in bringing the present motion is baseless and inappropriate. Ms. Erickson is neither using the present motion "as a backstop to the FINRA motion," nor vice versa. (Def.'s Memo. p.1.) The motions to compel filed in each of these actions sought similar, although not identical, information. This should come as no surprise, as both actions involve a similar core of operative facts. And Defendant's irrelevant and factually

2

inaccurate assertion that "[t]he FINRA arbitration panel recently denied most of Plaintiff's motion in an oral order ...." (Def.'s Memo. p.4 n.3) is contradicted by the written order issued by the FINRA panel, which shows that, in fact, the panel granted the vast majority of Ms. Erickson's requests. (A true and correct copy of the FINRA panel's order is attached hereto as "Exhibit A.")[1]

As Defendant notes in its memorandum, depositions in this case were taken over a period of weeks and continued up until the last day of the discovery period. (Def.'s Memo. p.3.) During these depositions, which involved the complex inner workings of a labyrinthine multinational financial institution, Plaintiff learned of the full breadth of the universe of relevant documents. Contrary to Defendant's assertions, these documents, which Ms. Erickson is now seeking to compel the production of, are responsive to a number of her discovery requests, as explained in detail below.

**ARGUMENT**

**I.      The Documents Produced Thus Far by Defendant Do Not Adequately Reflect Revenue Generated by, and Commissions Paid to, Other Client Advisors**

The essence of Defendant's objection to Ms. Erickson's request for revenue information is that "the NSTARS reports provide all the information that ... one needs in order to determine whether Plaintiff's compensation has been calculated by some discriminatory method." (Def.'s Memo. p.5.) If this were true, Defendant would be in sad shape indeed, as these reports show numerous instances of Ms. Erickson receiving no compensation for transactions that male Client Advisors *do* receive compensation for. When this has been brought to Defendant's attention,

---

[1] The FINRA panel order attached as "Exhibit A" was issued at approximately the same time that Defendant's Memorandum of Law in Opposition to Plaintiff's Second Motion to Compel was filed with this Court. The written order accurately reflects what the panel stated in the corresponding oral order that is mentioned in Defendant's Memorandum, page 4, footnote 3.

3

Defendant has responded that the explanation must be that male Client Advisors are "marking" their trades while Ms. Erickson is not. However, the reports provide no indication whatsoever of whether a trade has been marked. So either Defendant is implicitly conceding that it is discriminating against Ms. Erickson, or it has not produced "all the information that ... one needs in order to determine whether Plaintiff's compensation has been calculated by some discriminatory method," as they allege to have done. (Def.'s Memo. p.5.)

As an example, see Exhibits B and C attached hereto.[2] Exhibits B and C are excerpts from the NSTARS commissions reports for Ms. Erickson and a comparator male Client Advisor (both reports have been highlighted by counsel for Ms. Erickson to draw attention to specific transactions). Both reports reflect an excerpt of the business conducted by Ms. Erickson and the male Client Advisor in January 2008. In Exhibit C, the highlighted transaction reflects that on January 10, 2008, the male Client Advisor executed a "buy" transaction (as indicated by the "B" in the "B/S/F" column) for a quantity of 601.32 of a security entitled "UNITED STATES TREAS BILLS" at a price of 99.77% of par value. For this transaction, the male Client Advisor received a commission of $64.03, as indicated in the "PAYOUT AMOUNT" column.

Contrast this with Exhibit B: Ms. Erickson's commission report. The two highlighted transactions are also for "buy" transactions in the same security mentioned above, on the same date. Both transactions involved significantly larger volumes than the male Client Advisor's transaction. One of Ms. Erickson's transactions was priced slightly higher than the male Client Advisor's and one was priced slightly lower. Yet in both cases, Ms. Erickson received no compensation whatsoever, as reflected by the "0.00" in the "PAYOUT AMOUNT" column

---

[2] As both of these documents have been marked "Confidential" by Defendant, they are being filed under seal pursuant to the agreed protective order in this case.

(which was also the case for each of the twelve similar U.S. Treasury Bill transactions reflected on the page).

Put succinctly, if there is a non-discriminatory basis for Ms. Erickson having received no compensation for a transaction for which a male Client Advisor *did* receive compensation, it is not reflected in the NSTARS reports. Consequently, Ms. Erickson needs the additional reports that she is requesting so that Defendant cannot later claim that the types of discrepancies identified above are not explained away by some undisclosed factor which is not reflected on the reports.

While Defendant tries to paint the NSTARS reports as being comprehensive, they lack significant amounts of critical information. For example, they only contain very abbreviated descriptions of the securities being bought or sold. The reports being sought in this motion would provide, among other things, CUSIPs ("Committee on Uniform Security Identification Procedures" numbers), which are unique identifiers associated with every North American security that would enable Ms. Erickson to determine exactly which security is involved in every transaction that is under review. Additionally, the NSTARS reports do not identify which securities were bought or sold through Autobahn. Defendants assert that there is no evidence that any Client Advisor has ever been paid for any transaction executed through Autobahn (Def.'s Memo. p.10), but because the NSTARS reports do not show whether a transaction was executed through Autobahn, there is no way to know whether Defendant's basis for not compensating Ms. Erickson on a given transaction is that the transaction was through Autobahn or whether there was some other discriminatory motive.

During depositions, Ms. Erickson learned of specific reports that can be generated which would show necessary information. These reports should have been produced in response to

document requests propounded months ago. For example, Document Request No. 2 in Plaintiff's Second Set of Document Requests to Defendant (Ex. T to Pl.'s Motion) seeks "All documents concerning the total revenue, by client, by product, by month, for Defendant's Chicago branch. Document Request No. 13 in Plaintiff's First Set of Document Requests to Defendant seeks "Monthly summary reports for all PWM managing directors reflecting a breakdown that details all products and transaction volume from 2007 to present." To the extent that Defendant does not feel that the requested documents are responsive to any outstanding discovery requests, it is interpreting these requests in an unreasonably narrow fashion. *See generally Blanchard and Co., Inc. v. Barrick Gold Corp.*, 2004 WL 2785096 at nn. 3 and 5 (E.D. La. Dec. 1, 2004) ("Defendant is reminded that discovery requests are to be construed broadly").

While Defendant asserts that revenue information is adequately reflected in the NSTARS reports, when the former head of Defendant's fixed-income trading desk was asked what he would use if he wanted to find out how much revenue was attributable to a PCS client, he stated that he would generate a Bloomberg or Pershing report (which this motion seeks). (See Ex. F to Pl.'s Motion, 92:18-93:4.) And when one of Defendant's Rule 30(b)(6) witnesses was deposed about the universe of available reports, he indicated that while the NSTARS summarize commissions, there are "general MIS reports that summarize the total revenue by client advisors ...." (See 74:10-22 of the deposition of Slava Shafir, an excerpt of which is attached hereto as "Exhibit D.") These reports have not been produced but are clearly relevant to the issues at the heart of this case and represent the exact type of basic, foundational information that Ms. Erickson has been seeking since day one in this case.

Finally, Defendant's comments in footnote four of its memorandum (Def.'s Memo. p.5 n.4) misstate the circumstances surrounding Ms. Erickson's own production in this case. Ms.

Erickson has not "improperly removed" compensation data from DBSI. Information Technology personnel within Deutsche Bank, who were assisting Ms. Erickson with a problem, granted her access to this data.

Furthermore, Ms. Erickson's discovery requests sought the same documents that Defendant asserts Ms. Erickson "improperly removed." Defendant did not produce <u>any</u> documents, including these, until after Ms. Erickson was forced to file a motion to compel. Additionally, Defendant did not comply with these discovery requests from Ms. Erickson until Ms. Erickson first completed her own production and produced these documents to Defendant. Ms. Erickson was hospitalized for an extended period during the discovery process, which did result in some miscommunications, but Ms. Erickson ultimately completed her production of the documents in question even before Defendant had—and this in spite of the fact that Defendant is a large institutional entity presumably with a sizeable IT staff to handle these sorts of requests. (The relevant discovery requests were issued by Ms. Erickson and Defendant on the same day.)

**II.     The Evidence in this Case Suggests that the Autobahn "Grid" is not Hypothetical and Documents Relating to this "Grid" are Responsive and Relevant**

Defendant is simply wrong to assert that "[t]here is no testimony or evidence suggesting that such a hypothetical 'grid' has ever actually existed (nor does plaintiff point to any) ...." (Def.'s Memo p.10.) Plaintiff would point Defendant to the testimony of Hardy Manges (an excerpt of the deposition of Mr. Manges is attached hereto as "Exhibit E.") Mr. Manges testified at length about the "grid" and none of this testimony suggested that he was speaking in a hypothetical manner. In fact, he testified that he had explained the grid to Ms. Erickson (although Ms. Erickson denies this assertion). (Ex. E, 129:5-130:24.) In fact, he was so specific as to state that he even remembered the exact room he was in when he told her. (Ex. E, 130:16-24.)

In addition, documents relating to the "grid" would be clearly responsive to the document requests identified in Ms. Erickson's motion. (Pl.'s Motion p.8 n.4.) For example, Document Request No. 3 in Plaintiff's First Set of Document Requests to Defendant seeks "Any and all selling agreements currently in place ... necessary in order to conduct fixed-income business." (Ex. P to Pl.'s Motion, p.5.) A software grid implemented on an electronic trading platform clearly represents "infrastructure" and hence, these documents should be produced.

### III. Agreements Relating to Portals, Omnibus Accounts, and Sweep Accounts are Relevant and Responsive

The agreements requested in relation to portals, omnibus accounts, and sweep accounts are clearly captured by the language of Document Request No. 3 of Plaintiff's First Set of Document Requests to Defendant (Ex. P to Pl.'s Motion, p.5), the terms of which Defendant has materially misrepresented in its memorandum. Defendant states that Document Request No. 3 "was limited to selling agreements between PCS and other business units within DBSI ...." (Def.'s Memo. p.11) and that the request was limited to "intra-corporate agreement[s]," (Def.'s Memo. p.12). In fact, there is no language in the request which would limit it to intra-corporate agreements between units within DBSI. The exact language of the request is:

> Any and all documents reflecting the terms of any infrastructure currently in place, including without limitation selling and service agreements, joint ventures, revenue sharing agreements, brokerage agreements and clearing agreements necessary in order to conduct fixed-income business.

(Ex. P to Pl.'s Motion, p.5) There can be no question that these agreements, whether they be internal or with outside infrastructure providers, are responsive to this request.

Defendant asserts that "Plaintiff misrepresents the real reason why one team of CAs was paid on portal asset management business ...." (Def.'s Memo. p.12.) However, Ms. Erickson's representation of the reasons is based upon and consistent with deposition testimony in this case, but without seeing the relevant portal agreements, Ms. Erickson can only speculate as to why a

8

male-led team of Client Advisors is being paid for portal business while Ms. Erickson is not. And as Defendant points out, one reason that Mr. Bannerton gave for the male-led team being paid was that their situation involved a "disclosed model," (Ex. G to Pl.'s Motion, 74:24), Mr. Bannerton also testified extensively about how the reason the male-led team was being paid was that there was a more financially favorable agreement in place for that team. (*Id*. 75:2-21.) Consequently, it remains an open question as to exactly why this discrepancy exists as to which Client Advisors are paid for portal business and this question cannot be resolved without seeing the relevant agreements.

Furthermore, Defendant's current position—that Ms. Erickson and PCS "had nothing to do with the genesis of any portal client's investment" (Def.'s Memo. p.12)—contradicts positions it has taken in internal emails. For example, in one email, the former branch manager of the branch that Ms. Erickson works at was conveying discussions he was having with the relevant parties about putting an agreement in place to compensate Client Advisors for portal business. He specifically identifies Ms. Erickson as a Client Advisor who is affected by the lack of an agreement. (A true and correct copy of this email is attached hereto as "Exhibit F.") Clearly, the executives involved in these discussions felt that it was appropriate and possible to compensate her for her efforts in regard to portal business.

Defendant's assertions that Ms. Erickson cannot be paid for portal business because her clients are purportedly not "disclosed" also contradicts assurances that Defendant's management has made to her. In a December 11, 2008 email, one of Defendant's executives told Ms. Erickson that "if the portal can verify cli[en]t deposits ... should be ok..just need a verification." (A true and correct copy of this email is attached hereto as "Exhibit G.") Apparently, the obstacle of client disclosure can be overcome through a simple verification from the portal.

Once again, all of this shows that Ms. Erickson has a valid claim for payment these types of business and the terms of the relevant agreements are clearly relevant thereto and should have been produced.

### IV. Documents Related to Hiring Procedures are Extremely Relevant to a Case Involving Claims of Discriminatory Hiring and Are Responsive to Ms. Erickson's Discovery Requests

As identified in the deposition of one of Defendant's former human resources executives (Ex. L to Pl.'s Motion, 26:9-19), Defendant's human resources department consults flow charts to ensure that it is following standardized hiring procedures which are not discriminatory. The obvious relevance of these flow charts to this case, which involves discriminatory hiring, cannot be overstated. Defendant nonetheless refuses to produce them on the grounds that it believes that they are not responsive to Ms. Erickson's discovery requests.

To the contrary, these documents would be responsive to a number of outstanding requests, as identified in Ms. Erickson's motion. For example, Document Request No. 2 in Plaintiff's First Set of Document Requests to Defendant (Ex. P to Pl.'s Motion, p.5) seeks "All documents related to compensation plans applied to Managing Directors ...." A flow chart which directs how employment offers which set out compensation plans for Managing Directors is obviously responsive to this request. Interrogatory No. 10 in Plaintiff's First Set of Interrogatories to Defendant asked Defendant to "[d]escribe in detail the factors, performance ratings and circumstances taken into consideration by Deutsche Bank for both internal mobility and monetary awards in PWM during the time of Ms. Erickson's employment." (Ex. S to Pl.'s Motion, p.7.) As monetary awards are a significant component of many of the employment offers involved in this case, these flow charts would be "factors ... taken into consideration by Deutsche Bank for ... monetary awards ...." However, the flow charts were never disclosed or

10

referenced in any answer to this interrogatory. The flow charts requested in Ms. Erickson's motion are relevant, responsive, and should be produced.

**V.    The Attorney/Client Privilege Does Not Justify Redaction of the Information Redacted by Defendant**

To eliminate any lingering confusion surrounding exactly what was redacted pursuant to a claim of attorney/client privilege, a true and correct copy of the redacted version of the email produced in unredacted form as Sealed Exhibit O to Plaintiff's Second Motion to Compel is being attached hereto as "Exhibit H."[3] As can clearly be seen by comparing Sealed Exhibit H of this pleading to Sealed Exhibit O of Ms. Erickson's Second Motion to Compel, the redacted content does not reveal the substance of an attorney/client discussion.

It bears noting that the email which contains the allegedly privileged and confidential information, a December 4, 2007 email from Kevin Bannerton to George Hack (two executives of Deutsche Bank), was never produced in this case. Nor was it identified in either its Privileged Documents Log or its Supplement Privileged Documents Log (and any claim of privilege is arguably thereby waived). Ms. Erickson is only aware of this email because its text was copied into subsequently forwarded emails which were produced. Counsel for Ms. Erickson specifically requested that this document be produced (a true and correct copy of the letter making this request is attached hereto as "Exhibit I"), but counsel for Defendant declined to do so (a true and correct copy of Defendant's letter declining to produce the documents is attached hereto as "Exhibit J"). Obtaining the original version of this email is particularly important because the original email contained file attachments which, based on their file names, appear to be extremely relevant to issues in this case and likely should have been produced in their own right.

---

[3] Because this email was marked as "Confidential" by Defendant apart and aside from its claim of privilege, it is also being filed under seal. Ms. Erickson does not thereby concede that the document is, in fact, confidential.

(One file appears to involve payouts in Ms. Erickson's division and the other appears to involve proposed cash management processes, which are relevant because cash management is a substantial portion of Ms. Erickson's business. Furthermore, the file involving divisional payouts is labeled as a monthly file; presumably there are corresponding files for each month, all of which should have been produced.) These files do not appear anywhere in Defendant's production. Both the original email, including attachments, as well as each email in the ensuing string should be produced.

The redacted email is extremely relevant to this case because, as can be seen in the redacted version, the email discusses attempts to put an agreement in place to cover portal business. This is a key issue in this suit (see section III, *supra*). Furthermore, it may be relevant to allegations of retaliation. As discussed above, Defendant had been reassuring Ms. Erickson that a portal agreement would be put into place that would allow her to be paid for portal business. As reflected in the redacted email (Exhibit H hereto), management within Deutsche Asset Management ("DeAM," the entity currently receiving revenue on portal business) was discussing with an executive from Ms. Erickson's division (PCS) DeAM's willingness to put a portal agreement into place to share revenue with PCS. Tellingly, this email was sent by DeAM approximately one month after Ms. Erickson filed her charge of discrimination with the EEOC. Despite DeAM's apparent willingness to enter into an agreement at that time, here we are more than three years later and PCS has still not executed such an agreement. (Ms. Erickson would have been one of a very small number of Client Advisors to benefit from such an agreement being executed.)

Because the attorney/client privilege "is in derogation of the search for truth, it is construed narrowly." *Square D. Co. v. E.I. Electronics, Inc.*, 264 F.R.D. 385, 390 (N.D. Ill.

2009) (Keys, J.) (internal quotation omitted). The privilege protects "communications made in confidence by a client ... to an attorney ...." *Evan Law Group LLC v. Taylor* 2011 WL 72715 at *5 (N.D. Ill. Jan. 6, 2011) (Keys, J.) (internal quotation omitted). The privilege furthermore "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Id*. (internal quotation omitted). The communication revealed in Sealed Exhibit O to Plaintiff's Second Motion to Compel in no way appears to be the type of communication that "might not have been made absent the privilege" and does not appear to have been "necessary to obtain informed legal advice." Finally, "[t]he party asserting the privilege bears the burden of showing that the privilege applies and has not been waived." *Id*. (citation omitted). Defendant cannot meet this burden.

Furthermore, Defendant's assertions that this was an intra-corporate communication are unavailing. (Def.'s Memo. p.14.) The allegedly privileged email was sent from Kevin Bannerton to George Hack. As reflected in their email signature lines, Mr. Bannerton is an employee of Deutsche Asset Management, while Mr. Hack is an employee of Deutsche Bank Alex.Brown. (See Ex. H.) These are two separate legal entities. Defendants cannot invoke the separate legal existence of these two entities to deny Ms. Erickson compensation while simultaneously asserting that they are a single corporation for purposes of withholding documents. Even if the communication did disclose the substance of an attorney/client communication, the subsequent disclosure of that communication to a separate legal entity waived the privilege.

Consequently, Ms. Erickson is respectfully requesting that this Court order Defendant to produce all non-privileged documents withheld pursuant to a claim of privilege and that such documents be produced in unredacted form or that this Court conduct an *in camera* review of the

documents to determine whether Defendant has improperly withheld other documents and information in this case.

**WHEREFORE**, for the foregoing reasons, Ms. Erickson respectfully requests that this Court (1) order Defendant to comply in full with all discovery requests and orders of this Court identified in her second motion to compel; (2) award attorneys' fees for the instant motion in light of Defendant's lack of due diligence and persistent refusal to conduct discovery in good faith; and (3) award any further relief which this Court deems just and appropriate.

                                                Respectfully submitted,

                                                **PATRICIA ERICKSON**

                                                /s/ Ruth I. Major
                                                _____
                                                One of Her Attorneys

**Dated**: January 21, 2011

Ruth I. Major (ARDC No. 6205049)
Laura M. Rawski (ARDC No. 6300636)
The Law Offices of Ruth I. Major, PC
225 West Washington Street, Suite 2200
Chicago, IL 60606
Tel: (312) 893-7544
Fax: (312) 698-9867
rmajor@major-law.com
lrawski@major-law.com