**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA RUTH ERICKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 CV 965** |
| **v.** | ) | |
| | ) | **Hon. Ronald A. Guzman** |
| **DEUTSCHE BANK SECURITIES INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S RULING DENYING PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY**

Plaintiff, Patricia Ruth Erickson pursuant to Federal Rule of Civil Procedure 72(a), hereby objects to the ruling of Magistrate Judge Keys issued on February 9, 2011. In support of her objections, Ms. Erickson states as follows:

## I. INTRODUCTION

Ms. Erickson is a financial advisor in Defendant Deutsche Bank Securities, Inc.'s private wealth management group. Only approximately 3 out of over 200 financial advisors are female, or less than 2%. As the former Human Resources specialist responsible for Ms. Erickson's unit testified: "it was few and far between." The numbers get even worse at higher levels. Despite having 16 openings on its Executive Board, Deutsche Bank has not been able to find a single qualified woman to fill a spot during its entire history, which dates back to 1870. Several years ago this was an issue in a federal lawsuit brought by another female Managing Director at Deutsche Bank. Despite the earlier lawsuit, and this lawsuit, the Chief Executive Officer of Deutsche Bank, Josef Ackerman, recently made news throughout the financial world when he openly stated that he just has not been able to find a suitable woman to sit on the Board, but that

he looks forward to the day when he can find a woman capable for the position because she would make the Board "more colorful" and "prettier."

Ms. Erickson, unfortunately, has been adversely affected by Deutsche Bank's disregard and disrespect for women. When she interviewed for the position with Deutsche Bank she was told that she was getting the "standard deal," which she was specifically told did not include an upfront, or "signing bonus." Later, while at an event attended by numerous Deutsche Bank male financial advisors, one manager made a comment in her presence that all financial advisors are given stock at the time of hiring. When the comment was made, the Regional Director who had hired Ms. Erickson and had assured her she was getting the "standard deal," motioned to the speaker that he should drop the subject. This, however, and other incidents in the workplace, led Ms. Erickson to believe that she was not being treated similar to her colleagues. In fact, she was excluded from events where she could network with private bankers, she was not assigned clients with work similar to hers when another financial advisor resigned but they were instead assigned to a male California financial advisor, she was not paid on portal asset management business although a male colleague's team was, and her clients were not afforded protection from poaching by male colleagues elsewhere in the organization although her male counterparts were protected.

After joining Deutsche Bank, with the promise that her income would go up, Ms. Erickson's income has dropped from approximately $800,000 in 2006 while at Merrill Lynch to $86,000 in 2009 at Deutsche Bank, despite her book of business remaining constant or increasing. Throughout this litigation, Ms. Erickson has been attempting to determine how her male counterparts are paid for similar work. Indeed, her counterparts make hundreds of thousands of dollars per year while she makes substantially less.

In Plaintiff's motion to compel which was before this Court two months before the close of discovery, Plaintiff sought documents which would assist her in determining what compensation she was getting paid for and what she was not getting paid for. Similarly she sought such information for others handling the same types of products and transactions. This Court addressed several issues and then at the end directed the parties to attempt to resolve these issues between themselves. Subsequently, prior to the close of discovery, counsel for both parties had extensive telephone conversations and email and letter exchanges to work through these issues. Some issues, which were the subject of the Second Motion to Compel, were unresolved.

## II. THE STANDARD

Trial courts have authority to refer discovery disputes to magistrate judges, but a reviewing judge should not uphold any decision when a clear mistake of fact or law has occurred. *Weeks v. Samsung Heavy Indus. Co. Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997). When a party is denied access to discovery that is required to make a required showing, the court has abused its discretion. *See e.g. Gile v. United Airlines, Inc.* 95 F.3d 492, 499 (7th Cir. 1996).

## III. ARGUMENT

### A. The Agreements That Deutsche Bank Entered Into With Portals Are Discoverable and Should be Produced

In Plaintiff's First Motion to Compel, filed on October 19, 2010—two months before the close of discovery—Plaintiff sought information regarding Deutsche Bank's infrastructure concerning payment to financial advisors for fixed income business. One of the first items she sought production of was selling agreements, revenue sharing agreements, brokerage agreement, clearing agreements, etc. (Plaintiff's Motion to Compel, Document No. 17, p. 6). The documents were requested in order to determine why Plaintiff is not paid on certain fixed income

products when other advisors are. In fact, this Court recognized the relevance and explained to Defendant's counsel, "Well, if the selling agreements say she should be paid but she's not being paid and all of the others who are male are being paid; or, vice versa, if the selling agreements say she shouldn't be paid, nobody should be paid, but all the males are getting paid, it becomes relevant to gender." (Transcript of Proceedings before the Honorable Ronald A. Guzman, October 26, 2010, attached hereto as Ex. A, p. 10) During that hearing counsel for Defendant represented that Defendant had produced all selling agreements needed, which consisted of 2. Subsequently, in fact the evening before Rule 30(b)(6) depositions concerning the agreements were to be taken, Defendant produced another 17 selling agreements.

During the deposition of Kevin Bannerton, one of the Rule 30(b)(6) deponents, it was learned that a group of advisors led by a male financial advisor was receiving compensation for fixed income business (asset management business) transacted through a portal. (See Plaintiff's Second Motion to Compel, Document No. 41, p. 9). Ms. Erickson has been denied payment and has never been provided with any method by which she could get paid. One of the reasons given for the payment related to the terms of the agreement between Deutsche Bank and the portal. Mr. Bannerton testified that if the terms of the portals used by Ms. Erickson are not as favorable as the terms of the portal used by the group led by the male financial advisor, that can explain the difference. He also testified that the transactions by the male-led group are disclosed while Ms. Erickson's are not. (A portal is an external intermediary that clears the transaction between the client and Deutsche Bank). The portal agreements have never been produced and would shed light on whether Ms. Erickson's clients were transacting business through portals with similar or less favorable terms and whether the agreements provide for disclosure of clients or whether that is another example of an excuse given for not paying female financial advisors.

Despite the fact that this very issue was before the Court two months before the close of discovery, and despite the fact that the documents go to the issue of whether she should be paid or they should be paid (i.e. if the agreements that led to the male financial advisors being paid are similar to the agreements in place for Ms. Erickson's clients, then the claim that Mr. Erickson should not be paid based on the agreement concerning her portal will lack merit and a jury could infer that the real reason she was not paid was discriminatory), Magistrate Judge Keys would not order the production of the documents.

When the parties were before this Court in October, Plaintiff's counsel agreed to Defendant's request to limit the production to selling and service agreements only based on the representation of Defendant's counsel that "the other things…don't relate to payment of financial advisors. Only selling and service agreements would permit financial advisors to be paid." (Ex. A, p. 10). Plaintiff's counsel specifically said she would agree at that time to the production of those agreements based on the representations of the attorney but reserved her right to bring the issue back to the court if it was determined that all discoverable documents were not produced. (Ex. A, p. 12). Magistrate Judge Keys refused to order the production of the agreements entered into with the portals (production would consist of a handful of agreements) even though the agreements were clearly considered in Deutsche Bank's determinations as to whether Ms. Erickson would get paid. They are indeed part of Deutsche Bank's infrastructure as they are used in payout decisions. Magistrate Judge Keys instead ruled "You don't get those. You don't get those. Those are ruled out." (Transcript of Proceedings – Motion to Compel Before the Honorable Magistrate Judge Arlander Keys, February 9, 2011, Ex. B, p. 13). Magistrate Judge Keys stated "Mr. DeBaun argued that the agreements were irrelevant and Judge Guzman did not disagree." Magistrate Judge Keys' understanding of this Court's order is incorrect. In fact, this

Court rightfully acknowledged that it is "tough" for Plaintiff to know what types of agreements would be relevant (Ex. A, p. 12) and, like Plaintiff, proceeded by accepting as true Defendant's counsel's representations with the understanding the issue could be raised again if it turned out not to be accurate (Ex. A, p. 12).

Magistrate Judge Keys also seemed to come to the conclusion that Plaintiff's second motion to compel was untimely despite the fact that it was based on a motion that had been brought in October and that the agreement to limit the production was based on representations by counsel that turned out to be untrue (whether intentionally or unintentionally). In fact, it was learned during depositions taken in December (before the discovery cut-off) that the documents do play a part in the case but Magistrate Judge Keys ruled that we should have taken the depositions "a lot earlier,"' even though we took the depositions before the end of the discovery period. (Ex. B, p. 7) Moreover, counsel for Plaintiff advised the Magistrate Judge Keys that Ms. Erickson had been hospitalized for several weeks during the period preceding the motion to compel and worked part time for weeks following her hospitalization. Indeed, because of her medical concerns, Plaintiff was not able to assist in the case for at least 6 weeks. Nevertheless, the depositions that show that Defendant was not candid (or was just plain wrong) were taken in the discovery period and therefore a finding that the second motion to compel untimely is not warranted, unduly harsh, and contrary to the interests of justice.

Accordingly, Deutsche Bank first argued to this Court the documents weren't relevant, then argued that the documents had been produced, and then, when Plaintiff and this Court relied on Defendant's attorneys representations, now argues, and apparently persuades the Magistrate Judge, that the documents are not discoverable because they were able to keep the truth hidden from Plaintiff until the end of the discovery period.

Plaintiff filed the first motion to compel in October, and the second motion to compel in January, less than one month after learning of the documents and how they factored into pay considerations by Deutsche Bank, and with two major holidays in between and several additional attempts to obtain the documentation without court intervention. The documents are needed to show that Deutsche Bank's claims are without merit, that Ms. Erickson should have been paid for the work she brought to the bank through the portals and that the reason she was not so paid is due to unlawful discrimination. There is no justification for denying this discovery to Plaintiff. Defendant should not be rewarded for misrepresenting the facts and not being truthful until the end of the discovery period. Both the first motion to compel and the second motion to compel were timely filed. Accordingly Defendant should be ordered to produce all portal agreements requested in the Second Motion to Compel, including but not limited to, agreements with Chicago Mercantile Exchange, Bank of New York, Brown Brothers Harriman, Sungard and LaSalle Bank.

**B. Defendants Should Be Ordered to Produce The Details Supporting the Compensation Payments to Client Advisors**

Ms. Erickson sells different types of financial products and the commission she earns on the products can be a function of what type of product is involved, how the product was sold, and what the profit margin is that is embedded in the sale. The three main categories are (1) transactional products (products traded); (2) depository products; and (3) asset management products (such as money market funds). The products themselves can be sold through different vehicles. For example, shares of money market funds can be sold directly to the client, through an omnibus account, in which all of Ms. Erickson's firm's clients' purchases and sales are pooled together and the net position is effectuated by the firm, or through portals, as discussed above. Transactional products, such as corporate bonds, can be purchased by Ms. Erickson for

the client, or the client can purchase the bonds through a computer system called Autobahn. When Plaintiff's counsel appeared in court on the first Motion to Compel in October, Defendant's counsel agreed to provide the "detail" regarding the compensation. Rather than do so, an NSTAR report was produced that provided no sufficient detail for Ms. Erickson to determine what the products sold are and how they were sold. Ms. Erickson needs the detail concerning the compensation, which must include the embedded sales credit (the piece that in many transactions drives the commission to Ms. Erickson and other financial advisors), the method by which the product was sold (i.e. portal, omnibus account, direct, Autobahn, etc), and the details surrounding the product, such as the CUSIP (Committee on Uniform Security Identification Procedures). At the October hearing Plaintiff's counsel specifically asked for "detail" in order to understand "what the products they're selling" and "what trades they are doing." (Ex. A, p. 20). Deutsche Bank has confirmed in depositions that one would need to know this information in order to determine the appropriate payment. For example, in the reply filed in support of the second motion to compel, an example was addressed in detail (Document No. 49, p. 4) in which Ms. Erickson, on the same day, sold a product that appears to be the same product sold by a male financial advisor. Ms. Erickson sold a substantially larger quantity than the male colleague, yet was paid no commission, while the male financial advisor was paid commission. Without the detail for these transactions (either the trade tickets or a computer generated report which sets forth the information from the trade tickets), Ms. Erickson will be left to rely on the testimony of Defendant's witnesses on how this occurred and will have no independent method for testing or proving false the testimony.

Magistrate Judge Keys refused to order Defendant to produce detail showing what the transactions consisted of, stating "I am not talking about the broad 'we want everything that

would tell us how people are getting paid.' You have got to be more specific than that." (Ex. B, p. 22). When Plaintiff's counsel attempted to be more specific by at least identifying some reports that had been identified in depositions, Defendant's counsel claimed that those reports would also not provide the detail Plaintiff needed. Magistrate Judge Keys' response was then to allow Defendant to provide an affidavit that the specific reports identified by Plaintiff would not offer additional information, without ordering Defendant to provide information that would provide the detail concerning the products and methods of sale supporting the compensation data. Plaintiff is then left to guess at the details of the products underlying the commission data instead of being able to establish conclusively how her commission and compensation compares to her colleagues. In 2009 Ms. Erickson earned $86,000, approximately 10% of what she had earned her last year at Merrill Lynch, and substantially less than her male comparators. Magistrate Judge Keys acknowledged that it was "quite a big drop." Her production remains comparable to that during her last year at Merrill Lynch, yet her income is a miniscule fraction of her Merrill Lynch income, despite the fact that she was told she would earn more. Defendant should be ordered to provide the necessary information to determine what Ms. Erickson is getting paid. They have not established that it would be unduly burdensome to provide this information and until they do so it is improper to deny Ms. Erickson this discovery.

### C. Documents Showing the Assets Purchased Through Sweep and Omnibus Accounts Should be Produced

During the deposition of Kevin Bannerton, the 30(b)(6) witness identified as knowledgeable on the compensation for the asset management products, he testified that Client Advisors are paid on shares of the Asset Management products purchased through the omnibus accounts or through sweeps. (Document No. 41, p. 10). He testified that Ms. Erickson should fall into that category. Accordingly, Plaintiff asked for the data showing how much of her

clients' funds have been used to purchase asset management products through the sweep or omnibus accounts and for the data showing revenue/commissions going to any Deutsche Bank entity related to her clients' purchases. Those documents most certainly exist. Defendant's counsel objects saying that she is not paid and no client advisor is, in direct contradiction to the testimony of its own 30(b)(6) witness, and that since Plaintiff is not paid, there are no documents showing how much she is paid. Magistrate Judge Keys, despite the contradictory testimony of the 30(b)(6) witness, determined that if Defendant and its counsel now claim that no one is paid on that business that there is then no obligation for Defendant to produce the documents showing the revenues generated from the business and the commissions or revenue transferred to Ms. Erickson's unit for the business. (Ex. B, p. 32) In doing so, Magistrate Judge Keys has denied Plaintiff evidence which she needs to establish her liability and damage claim. Accordingly, Plaintiff requests the data on revenues generated through her clients' omnibus and sweep asset management purchases and the commissions and revenues transferred to her unit on same in order to determine damages. It will be left to the jury to determine, in reviewing the documents and the admissions by the 30(b)(6) witness, whether Ms. Erickson was discriminated against and what damages should be awarded.

**D. Defendants Should be Ordered to Produce DB Treasury Reports**

With regard to the depository products Ms. Erickson sells, the payout for the products is based on the formulas that are developed by the Treasury group. The formulas are required to determine Ms. Erickson's damages for non-payment on the products. Ms. Erickson requested the DB Treasury reports (Document No. 41, p. 6) as well as other reports which provide information that would be used to determine Ms. Erickson's compensation for selling depository products. Despite the fact that Ms. Erickson sells these products, and DB acknowledges that she

is supposed to be paid for these products, Defendant has refused to provide the supporting documentation so that she can compare her compensation for selling these products to the compensation others receive. Instead, again, Defendant's response is "if people get paid for DB Treasury products, it appears on NSTARS reports." (Ex. B, p. 47). Therefore, Ms. Erickson is provided with no method to determine whether she is getting paid less than her male counterparts for selling depository products or whether she is not getting paid for selling certain depository products. Instead, she is left to rely on Defendant's representations that what is there is correct, and is prevented from verifying the information. She is expected to just accept the conclusory numbers appearing in the reports. This position, adopted by Magistrate Judge Keys, is an untenable abuse of discretion. Ms. Erickson is entitled to see the relevant reports to determine for herself whether she has been discriminated against—to test the evidence—especially considering the overwhelming evidence that Deutsche Bank discriminates against women in her position.

   **E.  The Documents Withheld on Privilege Should be Reviewed by this Court *In Camera***

  In January 2011 Plaintiff's counsel received a document that was identified as privileged by Defendant. Another version of the document had already been produced by Defendant and not identified as privileged. A review of the non-privileged document showed that the document should not have been identified as privileged and raised red flags with Plaintiff's counsel that Defendant had taken an overbroad approach in withholding documents based on privilege. Accordingly, Plaintiff's counsel sought an *in camera* inspection in both the FINRA matter and before this Court. The FINRA Chief Arbitrator ordered Defendant to review the documents in the privilege log in light of federal case law on the issue of privilege and to produce any that appeared not to be privileged. In response, Defendant is now producing an additional six

documents that should not have been withheld, five which will have some redactions and one that will be produced without redactions. Defendant removed from the review documents responsive to the federal litigation discovery requests. Magistrate Judge Keys refused to conduct an *in camera* review because he said the request was untimely. Although Plaintiff's counsel advised the court that she did not have reason to believe that any documents had been improperly withheld prior to January, and even though the document was just marked "privileged" giving rise to the concern after the close of discovery, Magistrate Judge Keys said that the request for the *in camera* inspection was untimely because it came after the close of discovery. He said the objection had been "waived." (Ex. B, p. 53). Even when it was again explained that the facts that gave rise to the concern occurred after the close of discovery, and that the motion was then filed within a week or so of receiving that information, he said he did not agree and that as soon as we received the privilege log, without knowing what the documents were about or even knowing whether there any been any improper withholding, that we should have contacted counsel to discuss the privilege log and then filed a motion for an *in camera* inspection earlier.

Plaintiff respectfully disagrees with the position taken by Magistrate Judge Keys and believes that an *in camera* inspection is due in light of the erroneous withholding of the document in January, the recent production of 6 more documents that were previously withheld despite two motions being filed, and the other conduct of Defendant including claiming that all of the selling agreements had been produced (2) and then producing 17 more, and claiming that documents were locked and the passwords lost and then producing the passwords the day after this Court ordered Defendant to provide affidavits.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, and for the reasons set forth in Plaintiff's Second Motion to Compel and Reply in Support of Plaintiff's Second Motion to Compel, Plaintiff respectfully requests that this Court reverse the Magistrate Judge's ruling of February 9, 2011 as to the issues raised in this motion and direct Defendant to produce the documents which are responsive to the issues raised in this motion, and for all such other relief as this Court deems just and proper.

Respectfully submitted,

**PATRICIA ERICKSON**

/s/ Ruth I. Major

One of Her Attorneys

**Dated**: February 23, 2011

Ruth I. Major (ARDC No. 6205049)
Laura M. Rawski (ARDC No. 6300636)
The Law Offices of Ruth I. Major, PC
225 West Washington Street, Suite 2200
Chicago, IL 60606
Tel: (312) 893-7544
Fax: (312) 698-9867
rmajor@major-law.com
lrawski@major-law.com