IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA RUTH ERICKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 Civ. 0965 |
| v. | ) | |
| | ) | Hon. Ronald A. Guzman |
| DEUTSCHE BANK SECURITIES, INC., | ) | Hon. Arlander Keys |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S
RULING DENYING PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY**

SIDLEY AUSTIN LLP
Cliff Fonstein
Nicholas H. De Baun
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendant
Deutsche Bank Securities Inc.*

Defendant Deutsche Bank Securities Inc. ("DBSI"), by and through its counsel, Sidley Austin LLP, respectfully submits this memorandum of law in opposition to Plaintiff's Objections to Magistrate Judge's Ruling Denying Plaintiff's Second Motion to Compel (the "Objections").

## INTRODUCTION

Plaintiff's second motion to compel was properly denied by the Magistrate Judge. The Motion represented an abuse of this forum and a waste of the Court's (and Defendant's) time and resources. Nearly a month after the close of discovery, Plaintiff sought to compel Defendant to produce voluminous trading reports, not in aid of the instant discrimination action, as she claims, but rather in aid of her claims in a parallel arbitration proceeding pending before the Financial Industry Regulatory Authority ("FINRA"). Indeed, Plaintiff brought a motion before the FINRA arbitration panel on December 29, 2010, requesting many of the same documents sought by the instant motion, and then, as a backstop to the FINRA motion, filed her Motion weeks later.

As we explain below, the documents sought by Plaintiff's Motion were never requested by Plaintiff in this action at any time. Plaintiff attempted to conceal these facts from the Court in her voluminous motion papers by never directly quoting any of the requests to which she purports to compel responses, in the apparent hope that the Court would grant her requests without reviewing them, and she uses this stratagem again in her Objections. However, the Magistrate Judge properly concluded that Plaintiff failed to request the materials at issue and properly refused to allow Plaintiff to conduct new discovery beyond the discovery cutoff. Accordingly, the Court should overrule Plaintiff's Objections.

## BACKGROUND OF THE CASE

Plaintiff is a Client Advisor ("CA") in the Private Client Services Group ("PCS") at DBSI – her role is what the public would typically call a "stockbroker." Unlike many Client

Advisors, Plaintiff's clients are generally institutions rather than individuals, and Plaintiff specializes in fixed income products (*e.g.* bonds) rather than stocks.

Like all CAs in PCS, plaintiff is paid on a commission basis. Her entitlement to commissions is governed by an employment agreement and by a Commission Guide applicable to all CAs. Notably, if PCS does not earn revenues in connection with a transaction effected by the CA, the CA does not earn any commission. This can happen, *inter alia*, if the CA sells an investment product that is not offered by PCS, but by some other division of Deutsche Bank. In that case PCS will earn revenues only if it has an agreement with the other division of Deutsche Bank to share revenues related to that product, or if the CA "marks up" the price to the client, that is, if the client is willing to pay a price above the price the CA is able to secure.[1]

Plaintiff's dispute with DBSI is nothing more than an attempt to avoid the clear terms of her employment agreement – a binding agreement that she personally negotiated. In plain disregard of the terms of that agreement, and in plain disregard of the terms of the Commission Guide, Plaintiff seeks additional compensation from DBSI based on a kaleidoscope of unsupported allegations, rhetoric and legal theories, all of which spring from her meritless contention that DBSI should compensate her whenever her clients transact business with other units of DBSI, despite the fact that her employment agreement and DBSI's policies do not give her any right to compensation on those transactions, and despite the fact that DBSI does not compensate any other CAs, male or female, for the same type of transactions.

In addition to this action, Plaintiff has also commenced an arbitration against DBSI in the Financial Industry Regulatory Authority ("FINRA"). In the FINRA arbitration, plaintiff makes substantially the same factual allegations she makes here, but instead of claiming gender

---

[1] The practice of "marking up" (or "marking down") the price of securities by a broker-dealer is a wholly permissible and regulated activity.

discrimination, she claims she was fraudulently induced to join DBSI and that DBSI breached her employment contract.

In connection with discovery in this action, DBSI has produced more than 40,000 pages of documents. The documents produced by DBSI fully satisfy all of the demands that Plaintiff initially propounded in this case (to the extent DBSI did not object), as well all documents it was directed to produce by the Court in its decision on Plaintiff's prior motion to compel.

After the Court denied a motion by Plaintiff to extend the discovery period, discovery closed in this action on December 15, 2010. That same day, Plaintiff served her Fourth Set of Document Requests and her Second Set of Interrogatories, both of which purported to require Defendant to respond by January 14, 2010 – thirty days after the close of discovery. Just prior to the close of discovery, Plaintiff deposed several witnesses in December, and took the deposition of DBSI by a Rule 30(b)(6) notice, questioning six witnesses on more than 30 topics first noticed by Plaintiff on November 16, 2010.

On December 29, 2010, Plaintiff brought a motion before the FINRA arbitration panel to compel DBSI to produce a host of reports and information related to transactions undertaken by her clients. In particular, Plaintiff sought "revenue reports" related to fixed income trading done by her clients – despite the fact that DBSI had already produced complete commission reports for Plaintiff and a group of potential comparators.[2] Plaintiff also sought information related to the activity of PCS clients with separate business units of Deutsche Bank outside of PCS, including asset management activity (including so-called "portal" business and "sweep" accounts) and depository business.[3]

---

[2] The Court already presided over a dispute concerning the scope of comparators to be included in discovery, settling on a procedure whereby Plaintiff selected 35 potential comparators for discovery.

[3] The FINRA arbitration panel denied much of Plaintiff's motion in an order dated January 18, 2011.

Weeks later, *and without first conferring with Defendant*, Plaintiff brought her second motion to compel in this action on January 13, 2011, seeking the same information requested in the FINRA arbitration.[4] In her motion, Plaintiff also sought to compel the *en masse* production of documents from Defendant's privilege log because Plaintiff "question[ed] the methods employed by Defendant to make determinations as to which documents are covered by the attorney-client and work product privileges," ostensibly because Plaintiff disagrees with the application of the privilege to intra-corporate communications between non-attorneys which disclose the substance of other conversations with corporate attorneys.

As explained below, Plaintiff's requests are untimely, having been raised for the first time in this case by virtue of Plaintiff's Motion, weeks after the close of discovery. In fact, the timing of Plaintiff's motion and the fact that the discovery she now seeks bears little resemblance to the discovery she actually requested in this action proves that Plaintiff is using the discovery procedures of this forum to gain an improper advantage in the FINRA arbitration after FINRA largely denied her requests. Accordingly, Plaintiff's Objections should be overruled.

## ARGUMENT

**I. THE MAGISTRATE JUDGE'S ORDER WAS PROPER AND WAS NOT CLEARLY ERRONEOUS.**

This Court's "review of any discovery-related decisions made by the magistrate judge is governed by Rule 72(a) of the Federal Rules of Civil Procedure . . ." Weeks v. Samsung Heavy Indus. Co. Ltd., 126 F.3d 926, 943 (7th Cir. 1997) That Rule provides that the Court must uphold such an order unless it finds it to be "clearly erroneous or contrary to law." Id.; Fed. R. Civ. P. 72(a). "The clear error standard means that the district court can overturn the magistrate judge's

---

[4] Plaintiff's hasty Motion even sought to compel DBSI to produce documents from her untimely discovery requests served on the last day of discovery, which, had they not been untimely to begin with, nonetheless would not have even required responses at that point, as the motion was brought less than 30 days from the service of those untimely requests.

4

ruling only if the district court is left with the definite and firm conviction that a mistake has been made." Weeks, 126 F.3d at 943.

### A. Plaintiff Never Requested Agreements Related to Asset Management Portals.

Plaintiff's attempt to compel discovery of agreements related to portal asset management business fails for the simple reason that Plaintiff never requested any such agreements.

Plaintiff claims to need discovery of agreements between *Deutsche Asset Management* and the *third-party* investment "portals" that invest money with Deutsche Asset Management. In her Motion, Plaintiff cited her Document Request No. 3. However, such agreements would not fall within the scope of her Request No. 3, which was limited to "infrastructure" agreements between business units within DBSI. In fact, the language of the request – "Any and all documents reflecting the terms of any infrastructure currently in place, including without limitation selling and service agreements, joint ventures, revenue sharing agreements, brokerage agreements and clearing agreements necessary in order to conduct fixed-income business" – never mentioned any category of agreements that would capture any agreement between Deutsche Asset Management (a separate division that Plaintiff did not work for) and a third-party. (Req. No. 3, Pl.'s 1st Set of Doc. Req., attached as Exhibit A to the Declaration of Nicholas H. De Baun, Esq. ("De Baun Decl."), submitted herewith.)

Notably, Plaintiff's Motion also cited an interrogatory and a document request that were both served on the last day of the discovery period. Those discovery requests specifically sought discovery of "portal" agreements, and the Magistrate Judge properly ruled that those requests were untimely. Indeed, the fact that Plaintiff realized at the last minute that she would need to serve additional requests in order to capture such agreements makes it crystal clear that Plaintiff understood her Request No. 3 did not relate to such agreements.

5

Now, in her Objections, Plaintiff tries to distort the record to suggest that the Court already provided her with grounds to seek discovery of the portal agreements that she never requested. While she claims that "this very issue was before the Court two months before the close of discovery," (Pl.'s Obj. at p. 5), she fails to point the Court's attention to the fact that her Request No. 3, which was discussed with the Court during the October 26, 2010 hearing, did not cover portal agreements at all. In fact, the portions of the transcript of the October 26 hearing regarding Request No. 3 make it clear that the request concerns only *internal* agreements between divisions of DBSI, not any external agreements with third-party money management portals. (See Pl.'s Obj. Exh. A at 6:10-12:15.) In fact, the word "portal" was not uttered during the October 26, 2010 hearing. Thus, when Plaintiff argues that "Plaintiff's counsel agreed to Defendant's request to limit the production [in response to Request No. 3] to selling and service agreements only based on the representation of Defendant's counsel that 'the other things . . . don't relate to payment of financial advisors,'" (Pl.'s Obj. at p. 5), she conveniently ignores the fact that the "other things" requested by her Request No. 3 – i.e. "joint ventures, revenue sharing agreements, brokerage agreements and clearing agreements necessary in order to conduct fixed-income business" – never included "portal" agreements in the first place and were never part of the discussion before the Court on October 26, 2010.

Additionally, in her Motion and in her Objections, Plaintiff misrepresents herself as being similarly situated to the one team of CAs that was paid on portal asset management business in one instance. However, in that instance the portal in question was a "disclosed portal," meaning the third-party portal discloses the identity of the underlying client to Deutsche Asset Management, and there was also a dispute about how the client had been introduced to Deutsche Asset Management (i.e. PCS vs. the portal). (See Transcript of Deposition of Kevin Bannerton

6

at 74:12-76:20, De Baun Decl. Exh. B.) Such circumstances clearly eviscerate any argument that Plaintiff is similarly situated to that single CA team, as her clients investing in Deutsche Asset Management have, to the Bank's knowledge, only invested, if at all, in undisclosed portals, and Plaintiff and PCS had nothing to do with the genesis of any such portal client's investment. Indeed, Plaintiff makes no attempt to argue that she is similarly situated based on those factors. Accordingly, Plaintiff's untimely request on this topic should be denied.

> **B. Plaintiff Already Has All Relevant Trade Details Concerning the Compensation Paid to Other Client Advisors, and, in Any Event, <u>Plaintiff Never Requested the Reports Discussed in Her Motion.</u>**

As with Plaintiff's phantom and untimely request for "portal" agreements, Plaintiff's demand that DBSI produce voluminous trade tickets , or reports generated from trade tickets, fails for the simple reason that Plaintiff never requested these reports in the documents demands that she served on DBSI. Additionally, Plaintiff's request for trade tickets should be rejected because the production of trade tickets for Plaintiffs and her comparators would require DBSI to shoulder a herculean burden which would not provide Plaintiff with any additional useful information beyond the information already produced by DBSI.

> 1. <u>Plaintiff Never Requested the Trade Details She Now Claims to Need.</u>

Critically, Plaintiff never requested the various trade details she now claims to need in order to make sense of her compensation and that of her coworkers. Although Plaintiff's Motion failed to discuss her specific discovery requests in detail – a problem she compounds in her Objections by failing to even cite the purportedly relevant requests – we discuss each request cited by Plaintiff in her Motion, in turn, below. As will be made plain, the Magistrate Judge's determination that Plaintiff's current demands are untimely is amply supported by the record.

7

      a.  First Interrogatory No. 9.

First, Plaintiff requested the identity of "all managing directors in PWM generating less total revenue for Deutsche Bank then Ms. Erickson on an annual basis for 2007, 2008, and 2009." (Int. No. 9, De Baun Decl. Exh. C.) DBSI responded by referring Plaintiff to its production of "production rankings for relevant Client Advisors." (Supp. Response to Int. No. 9, De Baun Decl. Exh. D.) Thus, contrary to Plaintiff's deceptive citation in a footnote in her Motion, Interrogatory No. 9 did not remotely request the reports she seeks.

      b.  First Document Request No. 13.

Plaintiff requested "Monthly summary reports for all PWM managing directors reflecting a breakdown that details all products and transaction volume from 2007 to the present." (Doc. Req. No. 13, De Baun Decl. Exh. A.) As explained below, this request describes monthly summary reports that DBSI has already produced.

Following a disagreement between the parties over the appropriate population of CAs that should be included in DBSI's production of information concerning potential comparators, the Court allowed Plaintiff to select up to 35 purported comparators and DBSI then provided commission reports and other compensation data for those identified individuals. In particular, DBSI produced commission reports, known as "NSTARS" reports, for Plaintiff and the alleged comparator population. Request No. 13 was satisfied by the production of monthly summaries for Plaintiff and that comparator population. In fact, in addition to the monthly summaries in the NSTARS reports, DBSI included trade detail from the NSTARS system that shows *every single trade* completed by Plaintiff and the potential comparator population.

Notably, Plaintiff's Request No. 13 did not seek "trade tickets" nor did it specify that Plaintiff wanted any of the other information she now claims she must have. In fact, by

8

November 18, 2010, DBSI's production of NSTARS reports (including the trade-by-trade detail) was complete with respect to the entire employee population at issue, yet Plaintiff never demanded production of any further trade details nor sought to compel production of additional trade details until more than a month after discovery closed. This timing cements the fact that Request No. 13 did not call for the information that Plaintiff now seeks – which was already evident on the face of the request.

        c.      <u>Second Document Request No. 2.</u>

In her Second Set of Document Requests, Plaintiff requested "All documents concerning the total revenue, by client, by product, by month, for Defendant's Chicago branch." (Doc. Req. No. 2, De Baun Decl. Exh. E.) DBSI objected to this vague and overbroad request, but responded that it would produce "monthly financial results reports for its Private Client Services Group Chicago branch office" to satisfy the request. (Response to Req. No. 2, De Baun Decl. Exh. E.) Subsequently, Plaintiff never met and conferred with Defendant over Request No. 2. In any event, Request No. 2 relates only to the Chicago branch office, not to individual CAs, and has no relevance to Plaintiff's present claimed need to see the minutiae of every trade.

        d.      <u>Second Document Request No. 3.</u>

Plaintiff also requested "All documents concerning total revenue, by client, by product, by month for each of Ms. Erickson's clients. . ." (Doc. Req. No. 3, De Baun Decl. Exh. E.) DBSI objected to the request because it is vague and ambiguous and unduly burdensome, especially when viewed in the context of DBSI having already produced complete commission reports for Ms. Erickson showing all of the PCS revenue associated with each and every trade Ms. Erickson brokered. (Response to Req. No. 3, De Baun Decl. Exh. E.) Again, Plaintiff never

9

met and conferred with Defendant over Request No. 3. Moreover, Request No. 3 relates only to Plaintiff and in no way justifies Plaintiff's Motion seeking information relating to other CAs.

e. <u>Second Interrogatory No. 1, Fourth Request Nos. 2 and 3</u>

On December 15, 2010, the last day of the discovery period, Plaintiff propounded her Second Set of Interrogatories and her Fourth Set of Document Requests. On January 13, 2010, before any response to Plaintiff's untimely interrogatories and document requests would even have been due, Plaintiff brought her Motion. On January 14, 2010, DBSI objected to the interrogatories and document requests because they are untimely and irrelevant. Nevertheless, even if they were not invalid, those requests would not require the production of the various reports mentioned in Plaintiff's motion. (<u>See</u> Int. No. 1, De Baun Decl. Exh. F.; Doc. Req. Nos. 2 and 3, De Baun Decl. Exh. G.)

In sum, as shown above, Plaintiff never requested the trade tickets or reports described in her motion. This fact, standing alone, justifies the denial of Plaintiff's motion. Furthermore, the fact that Plaintiff never requested the reports only underscores the fact that Plaintiff is pressing her Motion in an effort to use the federal discovery apparatus to achieve her goals in the FINRA arbitration proceeding, as the FINRA panel recently denied her requests for this exact same information. The Court should deny Plaintiff's motion.

2. Requiring DBSI to Generate the Reports Would be Extremely
   <u>Burdensome and Would Not Shed Light on Any Issue in this Case.</u>

In her Objections, Plaintiff complains that the NSTARS reports do not provide enough detail about the transactions she and her colleagues executed for their respective clients. In particular, she points to an example she raised in her Motion wherein a male colleague sold U.S. Treasury Bills and received commissions on the sale, whereas Plaintiff has sold numerous U.S. Treasury Bills that have not generated any commissions (for PCS or herself). Plaintiff claims

10

that absent the "trade tickets or a computer generated report which sets forth the information from these trade tickets, Ms. Erickson will be left to rely on the testimony of Defendant's witnesses on how this occurred and will have no independent method for testing or proving false the testimony." (Pl.'s Obj. at p. 8.) As explained below, the discrepancy between Plaintiff's compensation and the males transacting in the same instruments is explained, quite simply, by the fact that those males were charging their clients a "marked" price, generating revenue for PCS which they were paid on, whereas Plaintiff was not "marking" her trades, was generating no revenue for PCS on those trades, and was getting paid her share of nothing, which was, unsurprisingly, nothing. Critically, as explained below, Plaintiff would still be "left to rely on the testimony of Defendant's witnesses" on this point even if she had the trade tickets. This argument is a red herring, as evidenced by the fact that *plaintiff did not question a single witness on this point* at the 10 depositions she took in this case. Accordingly, since it would require at least 400 staff-hours to generate the reports now sought in Plaintiff's Motion, and since the production of the information would not shed light on the issue that Plaintiff claims to be interested in, the Court should overrule Plaintiff's Objections.

        a.       Trade tickets would only disclose the same information as the NSTARS reports regarding whether a trade was "marked."

As noted above, in addition to monthly summary information, the NSTARS reports show every single trade that the CA's clients transacted. That information includes trade date, price, quantity, the gross commission (*i.e.* PCS's revenue) generated by the trade, the payout percentage applicable to the gross commission and the payout amount to the CA on the trade (*i.e.* her compensation for the trade). The fixed-income trades reflected in the NSTARS report, such as the U.S. Treasury Bills example cited by Plaintiff, are the same trades that would show up in

11

the Bloomberg trade ticket reports that Plaintiff claims she needs. (See Declaration of Josie Hall, dated February 24, 2011 at ¶ 3, De Baun Decl. Exh. H.)

Moreover, even if DBSI were to shoulder the enormous burden of producing reports of all the trade tickets for the hundreds of thousands of transactions reflected in the NSTARS reports, Plaintiff would be in the same position she presently laments, that is, relying on the explanation – which Plaintiff has no basis to challenge – that any discrepancy in commissions paid to male CA's on the same products she has not been paid on is fully and simply explained by the fact that the other CAs "marked" those trades and she did not. Accordingly, the Court should reject her claim that she needs DBSI to produce mountains of information to satisfy requests that she never propounded, when the information at issue would not even shed light on an allegation that she has never articulated any good-faith basis to make.

    b. <u>Production of the Bloomberg trade ticket reports Plaintiff demands would require DBSI to shoulder an enormous, unwarranted burden.</u>

In addition to the uselessness of the trade ticket information Plaintiff now demands, the Court should deny Plaintiff's demand because it would place an undue burden on DBSI. Extracting the requested information from the Bloomberg system would require the creation of over 12,000 reports – at least one report for each of the unique client accounts serviced by Plaintiff and the comparator population since the beginning of Plaintiff's employment with DBSI. (See Declaration of Josie Hall, dated March 2, 2011 at ¶¶ 2-6, De Baun Decl. Exh. I.; see also De Baun Decl. ¶ 11.) DBSI estimates that such an effort would require at least 400 staff-hours (or more than ten 40-hour weeks) to complete. (See De Baun Decl. Exh. I at ¶ 6.) Such a massive effort obviously outweighs the negligible probative value of the requested information. Accordingly, Plaintiff's Objections should be overruled.

### C. Plaintiff Never Requested Any Agreements Related to "Omnibus," "Sweep" Accounts.

In her Motion, Plaintiff claimed that she has not been paid on "omnibus," "sweep" account business conducted by her clients, and, therefore, she needs discovery of an agreement with a third-party, Pershing LLC, regarding such accounts. (Pl.'s Br. at 10-11.) Once again, the requested agreement would not fall within the scope of her Document Request No. 3, as it would not be the type of intra-corporate agreement called for by that request, nor is it the type of agreement "necessary in order to conduct fixed-income business," as specified in the request.

Moreover, Plaintiff misleads the Court when she claims that there is testimony suggesting that other Client Advisors have been paid on "omnibus" "sweep" business. Contrary to Plaintiff's assertions, the testimony only indicates that when PCS Client Advisors successfully *sell* money market funds to their clients, PCS and the Client Advisor get paid on that business. (See Bannerton Dep. Tr. at 61:13-62:21, De Baun Decl. Exh. B.) But that has nothing to do with the practice of automatically "sweeping" client cash into a giant "omnibus" account for a wholesale investment in a money market fund, and Plaintiff is wrong to suggest otherwise.

### D. Plaintiff Never Requested "DB Treasury Reports," Nor Did She Argue for Their Production in Her Motion to the Magistrate Judge.

In her Objections, Plaintiff contends that certain "formulas that are developed by the Treasury group . . . are required to determine Ms. Erickson's damages for non-payment on the products." (Pl.'s Obj. at p. 10.) She then abruptly claims that there are "DB Treasury reports" that she requested and that should be compelled by her Motion. (Id.) While she fails to coherently explain how this information relates to any allegation she has made in this case – nowhere in her Complaint does she allege that she has been paid less than men on these products, nor does she have any basis to make such an allegation – the more glaring failure is Plaintiff's failure to ever request "DB Treasury reports" in any document request and her failure to make

any of her current arguments in her Motion to the Magistrate Judge. Indeed, the only prior mention of "DB Treasury reports" is in a single sentence in her Motion, lumped together in a laundry list of reports she claimed to need. (See Pl.'s Mot. at p. 6.) As described in Section I.B.1, *supra*, the requests cited by Plaintiff in her Motion did not call for production of the reports she now claims to need. Accordingly, Plaintiff's Objections should be overruled

### E. The Magistrate Judge Properly Rejected Plaintiff's Challenge to DBSI's Privilege Log.

In her Objections, Plaintiff's focuses her argument exclusively on the Magistrate Judge's decision that her challenge to the privilege log was untimely. Despite Plaintiff's strained attempt to suggest that she could not have raised her challenge earlier, the Magistrate Judge properly held that because Plaintiff never sought to challenge Defendant's assertion of privilege during the discovery period, she waived any objection to DBSI's assertions of privilege. That ruling is amply supported by case law and common sense. See, e.g., Sparton Corp. v. U.S., 77 Fed. Cl. 10, 16 n.8 (Ct. Cl. 2007) ("The proper time to have objected to the assertion of privilege was when Plaintiff received Defendant's privilege log or, if not then, certainly before the close of fact discovery."). Indeed, Defendant provided Plaintiff with the bulk of its privilege log several months before the close of discovery and there was nothing to prevent Plaintiff from challenging the entries at that time. (De Baun Decl. ¶ 12.)

Moreover, Plaintiff completely fails to support the blunderbuss argument she made in her Motion that the Court should review hundreds of documents *in camera* because she disagreed with DBSI's assertion of privilege over a single email. In making her Motion – without ever conferring with Defendant – Plaintiff overlooked settled law that extends the attorney-client privilege to intra-corporate communications among non-attorneys that disclose the substance of an attorney-client communication. See, e.g., Heriot v. Byrne, 257 F.R.D. 645, 665 n.14 (N.D. Ill.

14

2009) (holding that "privilege applies when the communications between non-lawyer employees 'reveal, directly or indirectly, the substance of a confidential attorney-client communication'"). In short, DBSI appropriately protected its privileged communications and Plaintiff's assertion that the Court should now audit DBSI's privilege log is untimely and meritless.

## Conclusion

For the foregoing reasons, Deutsche Bank Securities Inc. respectfully requests that this Court deny plaintiff's Second Motion to Compel in its entirety, together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 3, 2011

SIDLEY AUSTIN LLP

By: s/ Nicholas H. De Baun
    Nicholas H. De Baun

787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendant*
 *Deutsche Bank Securities Inc.*

## CERTIFICATE OF SERVICE

I, Nicholas H. De Baun, hereby certify that on March 3, 2011, a true and correct copy of the foregoing Defendant's Memorandum of Law in Opposition to Plaintiff's Second Motion to Compel was served by email and by U.S. Mail, postage prepaid upon the following:

> Ruth I. Major, Esq.
> The Law Offices of Ruth I. Major, PC
> 225 West Washington Street, Suite 2200
> Chicago, Illinois 60606
> rmajor@major-law.com


                                                    s/ Nicholas H. De Baun

NY1 7579123